481 A.2d 855

COMMONWEALTH of Pennsylvania

v.

Elmo SCATENA, a/k/a Terry E. Scatena, Appellant.

COMMONWEALTH of Pennsylvania

v.

Gerard SCATENA, a/k/a Jerry Scatena, Appellant.

COMMONWEALTH of Pennsylvania

v.

Louis SCATENA, Appellant.

Superior Court of Pennsylvania.

Argued Jan. 11, 1984.

Filed Aug. 3, 1984.

Petition for Allowance of Appeal Granted Nov. 20, 1984.

Petition for Allowance of Appeal Denied Nov. 20, 1984.

416

418

420

William A. DeGillio and Lawrence D. MacDonald, Wilkes-Barre, for appellants.

K. Douglas Daniel and Keith Welks, Deputy Attorneys General, Harrisburg, for Commonwealth, appellee.

Before CAVANAUGH, McEWEN and HOFFMAN, JJ.

McEWEN, Judge:

This consolidated appeal has been taken from the judgments of sentence [1] imposed after a jury found appellants

---

1. Appellant Elmo Scatena was sentenced to serve a total term of imprisonment of from eleven months to twenty-two months and to pay a total fine of $195,000.00 for violations of the Clean Streams Law and 25 Pa.Code § 97.27, the regulation prohibiting the discharge of waste into mines. He was also sentenced to a one year term of probation for conspiracy to violate the Clean Streams Law and to a concurrent five year term of probation for conspiracy for risking

guilty of risking catastrophe,[2] public nuisances,[3] and violations of both the Clean Streams Law[4] and the regulation prohibiting the discharge of waste into mines,[5] and found appellant Elmo Scatena guilty of conspiracy.[6] The brief of appellants expresses the following contentions:

(1) The evidence was insufficient to sustain their convictions for risking catastrophe and for violations of the Clean Streams Law and the regulation prohibiting the discharge of waste into mines, and to sustain the conviction of Elmo Scatena for conspiracy.

(2) The suppression court erred by reason of the denial of their motion to suppress certain physical evidence.

(3) The trial court erred by reason of:

(a) The failure to quash as duplicitous the informations charging violations of the Clean Streams Law, 35 P.S. §§ 691.301 and 691.307;

(b) The failure to quash, by reason of the failure to comply with Pa.R.Crim.P. 225(c), the informations charging the discharge of waste into mines;

(c) The admission into evidence of business records;

(d) The denial of their motions for mistrial; and

(e) The supplemental instruction to the jury that it could predicate a finding of guilt upon the crimes of

catastrophe, as well as a five year concurrent term of probation and a $5,000.00 fine upon the crime of risking catastrophe. Appellants Gerard and Louis Scatena were each sentenced to a total term of probation of four years and total fines of $127,500.00 for violations of the Clean Streams Law and the discharge regulation, and to a consecutive one year term of probation and fine of $2,500.00 upon the crime of risking catastrophe.

2. 18 Pa.C.S. § 3302(b).

3. While appellants were found guilty of public nuisances, 18 Pa.C.S. § 6504, the trial judge arrested judgment upon this crime and the court en banc affirmed.

4. Act of June 22, 1937, P.L.1987, as amended, 35 P.S. § 691.1 et seq. Appellants were specifically charged under §§ 691.301 and 691.307 of the Clean Streams Law.

5. 25 Pa.Code § 97.72.

6. 18 Pa.C.S. § 903(a)(1), (2).

risking catastrophe, public nuisance and/or criminal conspiracy without being able to specifically identify dates for certain of those charges.

(4) The statute defining the crime of risking catastrophe is unconstitutionally vague.

(5) The fines imposed were illegally assessed.

(6) The term of imprisonment imposed upon Elmo Scatena was both excessive and in violation of his right against double jeopardy.

We affirm in part and reverse in part.

The court en banc aptly summarized the facts:

Elmo Scatena is the owner and operator of a service station known as Highway Auto Service and located on Pa. Route 315 at the intersection with I–81 in Pittston Township, Luzerne County. The Commonwealth charged that from August, 1978 through July, 1979, Elmo and his sons for a fee wilfully or negligently discharged inadequately treated industrial wastes including but not limited to cyanide, dichlorobenzene, napthalene, waste oil and other substances harmful to human health through a borehole on the Highway Auto Service property into an abandoned mine. The Commonwealth further contended that this discharge found its way to groundwater and eventually to the Susquehanna River through the Butler Mine Tunnel in Pittston, commencing on July 29, 1979, and continuing to the filing of criminal charges on February 14, 1980; that the mixture of chemicals underground created toxic gases; and that these actions posed a substantial threat to public safety and welfare. Each day of continued discharge into the Susquehanna River as well as each instance of discharge into the borehole was treated as a separate offense.

To prove the charges contained in the informations, the Commonwealth sought to establish through the testimony of former truck drivers of the Hudson Oil Company of Edgewater, New Jersey, a scheme for disposing of waste materials hauled by Hudson Oil trucks from various industrial manufacturers. Four drivers testified that

they were instructed by their dispatchers from either the Hudson terminal in Edgewater or the terminal in Syracuse, New York, to travel to Highway Auto where, upon arrival, they would proceed to the southerly side of the garage, back the tanker between some barrels, disabled trucks, and the garage, and with the assistance of one of the defendants, dispose of the contents of the truck through a hose which emptied into the borehole. Each time the Scatenas would receive a cash payment, first $150.00, then $200.00. After the driver delivered the money, which he had received from his dispatcher, and disposed of the waste, he would place a collect telephone call to the Edgewater terminal. The drivers who testified did so under a grant of immunity from prosecution. The Syracuse dispatcher testified following a plea of guilty to a charge of conspiracy to create a public nuisance. The Commonwealth sought to link the dumping of waste materials into the borehole with the discharge of pollutants into the Susquehanna River by the use of a dye test which was performed on August 8, 1979. Two and one-half gallons of a concentrated dye were poured into the borehole by Pennsylvania Department of Environmental Resources (DER) investigators, and sixteen hours later traces of the dye were detected at the Butler Mine Tunnel outfall into the Susquehanna River at Pittston. The Commonwealth also attempted to show the dangerous nature of the waste materials dumped into the borehole through the testimony of a DER official and a private contractor for the federal Environmental Protection Agency who performed inspections of the Butler Mine Tunnel on July 31 and August 1, 1979. The condition of the river in early August, 1979, after discharge began was established through photographs showing the effluent, a sheen on the surface of the water, and containment booms at the outfall of the tunnel.

Appellants assert that the evidence was insufficient to convict them of risking catastrophe, of violation of the Clean Streams Law and of discharge of waste into mines.

They also assert that there was insufficient evidence to sustain the conviction of Elmo Scatena for conspiracy. The well-established test for reviewing the sufficiency of the evidence is:

'[w]hether, accepting as true all the evidence and all [the] reasonable inferences therefrom upon which if believed the [finder of fact] could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime or crimes for which he has been convicted.' *Commonwealth v. Bayard,* 453 Pa. 506, 509, 309 A.2d 579, 581 (1973); *Commonwealth v. Paquette,* 451 Pa. 250, 301 A.2d 837 (1973). In this regard it must be noted that the finder of fact has the right to reject part or all of the [witness'] testimony even if uncontradicted. *Commonwealth v. Chermansky,* 430 Pa. 170 at 174, 242 A.2d 237 at 240.

*Commonwealth v. Young,* 494 Pa. 224, 228, 431 A.2d 230, 232 (1981) *quoting Commonwealth v. Taylor,* 461 Pa. 557, 560, 337 A.2d 545, 546 (1975).

■■■ We first address the contention that the evidence was insufficient to convict appellants of risking catastrophe.[7] Section 3302(b) of the Crimes Code provides:

**(b) Risking catastrophe.**—A person is guilty of a felony of the third degree if he recklessly creates a risk of catastrophe in the employment of ... dangerous means listed in subsection (a) of this section.

18 Pa.C.S. § 3302(b). "Dangerous means", as set forth in § 3302(a), include any "harmful or destructive force or substance" as well as "any other means of causing potentially widespread injury or damage". A person is guilty of risking catastrophe if, in the use of dangerous means, he

7. Appellants also contend that "the statute defining the crime of risking a catastrophe is unconstitutionally vague." Since the Pennsylvania Supreme Court, in *Commonwealth v. Hughes,* 468 Pa. 502, 364 A.2d 306 (1976), rejected a similar challenge to the constitutionality of this statute, this contention must be rejected. *See also Commonwealth v. McGinnis,* 481 Pa. 394, 396 n. 3, 392 A.2d 1350, 1354 n. 3 (1978) (Roberts, J., dissenting). In any event, this contention becomes moot in view of our disposition of this sufficiency assertion.

" 'consciously disregards a *substantial* and *unjustifiable risk*' and thereby unnecessarily exposes society to an extraordinary disaster. *Commonwealth v. Hughes, supra,* 468 Pa. at 513, 364 A.2d at 311 (emphasis omitted and supplied)." *Commonwealth v. Simkins,* 297 Pa.Super. 258, 262, 443 A.2d 825, 827 (1982). The Commonwealth sought to establish that appellants risked a catastrophe by (1) the creation of a potential danger of explosion within the abandoned Butler Mine Tunnel; (2) the generation and potential release of poisonous gas from within the mine and tunnel; and (3) the discharge of contaminated waste oils and other dangerous chemicals into the Susquehanna River. While the record here demonstrates that appellants acted in a reckless manner, we are, nonetheless, constrained to reverse these specific convictions since the evidence was insufficient to establish that appellants "created a potential for an 'extraordinary disaster.' " *Id.* The Commonwealth simply failed to meet its burden of proof since the evidence does not sufficiently demonstrate that the substances discharged through the borehole were inherently dangerous or that the improper handling of them had the capability of causing widespread injury or damage. We, therefore, set aside and vacate the judgments of sentence for risking catastrophe.

■ First, with regard to the allegation that appellants created the risk of an underground explosion, even though an expert witness testified on direct examination that he was "concerned that somewhere underground [there was] a large accumulation of combustible gas", that expert as well as another Commonwealth expert testified that "there was no eminent danger of an explosion". The evidence was, therefore, insufficient to convict appellants of risking catastrophe on this basis.

■ Second, with regard to the purported release of poisonous gas within the mine and tunnel, two Commonwealth expert witnesses who had conducted explosibility tests at the mouth of the Butler Mine Tunnel each testified that they felt "dizzy" immediately after performing the tests.

There was, however, no evidence to establish the existence of poisonous gas within the mine and tunnel. While the Commonwealth introduced testimony that samples retrieved from the Butler Mine Tunnel revealed traces of liquid cyanide, there was no evidence of any gaseous cyanide. The evidence did not, therefore, sufficiently prove that the substances discharged through the borehole risked a catastrophe by reason of the generation and potential release of poisonous gas.

Nor has the assertion that a catastrophe was risked by reason of the contamination of the public water supply as a result of the discharge of waste oil and untreated chemicals into the Susquehanna River been sufficiently proven. While the Commonwealth undertook to prove that appellants risked a catastrophe by showing that traces of the chemicals dichlorobenzene and cyanide were detected in various samples retrieved from the borehole and the Butler Mine Tunnel outflow after July 25, 1979, the Commonwealth failed to present sufficient expert testimony that would have supported the conclusion that the toxic effect of the various concentrations of the chemicals actually retrieved would have been harmful to human life. Nor may we overlook the fact that while the evidence establishes that additional samples taken from the borehole and the outflow contained numerous other chemical substances,[8] the Commonwealth did not present sufficient evidence from which to conclude that the chemicals represented a risk of such widespread damage as is contemplated by the statutory term "castastrophe".

■ It is true that a defense expert indicated on cross-examination that dichlorobenzene is to some extent bioaccu-

8. The record establishes that tests upon samples taken from both the interior of the borehole and the vicinity of the Butler Mine Tunnel outfall revealed the same traces of trichloroethylene, tetrachloroethylene, zylenes, straight-chained alkanes, substituted benzine, napthalene, methylnapthalenes, dimethylnapthalene, acenaphthene, methylacenapthalene, phenolic material, polynuclear aeromatic moleculor weight 178, phenanthrene, anthracene, polynuclear aeromatic moleculor weight 202 and dioccylphthalate or diethyl hexyl phthalate.

mulative and that in fairly large doses, it would cause liver damage and possibly kidney damage; however, there was no testimony to establish the toxicity of the dichlorobenzene in the actual, considerably lesser concentrations that were detected in the samples. It is also true that a chemist in charge of analytic operations for the Pennsylvania Department of Environmental Resources testified on cross-examination that "sodium cyanide could diffuse through your fingers and it could cause death, or you could ingest it and it could cause death"; however, that witness was only able to speculate that the cyanide traces actually retrieved from the samples were *"probably* sodium cyanide." Finally, the only evidence in connection with waste oils discharged into the river concerned individual observations by witnesses of an oil sheen upon the river and photographs depicting the slick, and not the manner by which the film was inherently dangerous, namely, how it could create a potential for widespread injury or damage. Thus, notwithstanding the overwhelming evidence that appellants had emptied untreated wastes from industrial sources through the borehole which flowed by way of the Butler Mine Tunnel into the Susquehanna River, there was insufficient evidence to substantiate that this effluent would have, in fact, exposed society to such a toxic impact as would result in catastrophe.

■ We reject, however, the further assertion of appellants that the evidence was insufficient to sustain their convictions under the Clean Streams Law and the regulation prohibiting discharge of waste into mines. Appellants were each charged with numerous violations under sections 691.301 and 691.307 of the Clean Streams Law, which respectively provide, in part:

**691.301. Prohibition against discharge of industrial wastes**

No person ... shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Common-

wealth [9] any industrial wastes,[10] except as hereinafter provided in this act.

### § 691.307. Industrial waste discharges

No person ... shall discharge or permit the discharge of industrial wastes in any manner, directly or indirectly, into any of the waters of the Commonwealth unless such discharge is authorized by the rules and regulations of the board or such person ... has first obtained a permit from the department. For the purposes of this section, a discharge of industrial wastes into the waters of the Commonwealth shall include a discharge of industrial wastes by a person ... into a sewer system or other facility owned, operated or maintained by another person or municipality and which then flows into the waters of the Commonwealth .... A discharge of industrial wastes without a permit or contrary to the terms and conditions of a permit or contrary to the rules and regulations of the board is hereby declared to be a nuisance.

Appellants were also charged with several violations of the prohibition against discharge of waste into mines which declares:

9. The Clean Streams Law defines "Waters of the Commonwealth" as follows:

> [A]ny and all rivers, streams, creeks, rivulets, impoundments, ditches, water courses, storm sewers, lakes, dammed water, ponds, springs and all other bodies or channels or conveyance of surface and underground water, or parts thereof, whether natural or artificial, within or on the boundaries of this Commonwealth.
> 35 P.S. § 691.1.

10. The definition of "Industrial waste" under the Clean Streams Law is:

> [A]ny liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from any manufacturing or industry, or from any establishment, as herein defined, and mine drainage, silt, coal mine solids, rock, debris, dirt and clay from coal mines, coal collieries, breakers or other coal processing operations. "Industrial waste" shall include all such substances whether or not generally characterized as waste.
> 35 P.S. § 691.1.

## § 97.72. Discharge into mines.

Discharge of inadequately treated wastes ... into the underground workings of active or abandoned mines is prohibited.[11]

25 Pa.Code § 97.72. The record makes abundantly clear that each appellant discharged or permitted the discharge of inadequately treated industrial wastes without a permit into the underground workings of the abandoned Butler Mine and that, as a result, they allowed the discharge of industrial wastes into the waters of the Commonwealth, namely, the waters within the mine, the tunnel and the Susquehanna River. There is, therefore, no merit to the contention that the evidence was insufficient to convict appellants for violations of the Clean Streams Law and the regulation against discharge into mines.

Nor is there any merit to the contention that the evidence was insufficient to find appellant Elmo Scatena guilty of conspiracy by reason of the purported failure to establish that he had either actively participated in or entered into an unlawful agreement to engage in conduct which constituted a crime. Although a common understanding or agreement is an essential element of a conspiracy, direct proof of an explicit or formal agreement is not required. Rather, a conspiratorial agreement may be established by circumstantial evidence, namely, by showing the conduct and circumstances of the parties as well as the overt acts on the part of co-conspirators. *Commonwealth v. Rodgers*, 500 Pa. 405, 407, 456 A.2d 1352, 1353 (1983); *Commonwealth v. Kennedy*, 499 Pa. 389, 393, 395, 453 A.2d 927, 929–30 (1982); *Commonwealth v. Davis*, 312 Pa.Super. 85, 89, 90, 458 A.2d 248, 250 (1983); *Commonwealth v. Middleton*, 269 Pa.Super. 17, 21, 409 A.2d 41, 43 (1979). Elmo Scatena not only himself disposed of industrial wastes, but he also directed his sons to similarly make such disposals. Moreover, the Commonwealth presented (1) a book seized from the business office of the president of

11. Pursuant to Section 691.602(b) of the Clean Streams Law, the willful or negligent violation of this regulation is a misdemeanor of the third degree.

Hudson Oil which read, in part: "Scranton, 717–654–9851. *Terry*. $200.00. Was $150.00. Route 380 north to route 81 south. DuPont Exit, Highway Garage" (emphasis added); (2) testimony that Elmo Scatena had requested Hudson Oil to send a "hot load" in order to make the borehole drain better; and (3) testimony that Scatena, himself, indicated to a government agent that even though he might be convicted, no one else would be convicted since he would not disclose their identity. There was sufficient direct and inferential proof to convict Elmo Scatena of conspiracy.

■■■■■■■ Appellants next assert that the suppression court "erred in finding that [appellant] Elmo Scatena knowingly and freely consented to a search of the Highway Auto premises on August 2, 1979", as a result of which the judge denied their motion to suppress physical evidence.[12] When we study the findings of a suppression court, we consider only the evidence of the Commonwealth witnesses and so much of the evidence of the defense, as fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Silo*, 480 Pa. 15, 18, 389 A.2d 62, 63 (1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1053, 59 L.Ed.2d 94 (1979); *Commonwealth v. Kichline*, 468 Pa. 265, 280–81, 361 A.2d 282, 290 (1976). This court, although not bound by the conclusions of law reached by the suppression court, must follow the findings of fact of the suppression court if the findings are supported by the record. *Commonwealth v. Markman*, 320 Pa.Super. 304, 308–309, 467 A.2d 336, 338 (1983); *Commonwealth v. Chandler*, 312 Pa.Super. 1, 3, 458 A.2d 204, 205 (1983). We have consistently refused to substitute our own findings of fact for those of the suppression court, especially where credibility is at issue. We so refuse because the credibility of witnesses and the weight to be accorded to their testimony is a matter exclusively within the province of the suppression court. *Common-*

12. The evidence which appellants argue was suppressible included: (1) photographs of the borehole and premises as well as a videotape of the entire premises; (2) the results of the die tests subsequently conducted; and (3) soil samples from the borehole area and samples from the interior of the borehole.

*wealth v. Lapia*, 311 Pa.Super. 264, 281, 457 A.2d 877, 886 (1983); *Commonwealth v. Neely*, 298 Pa.Super. 328, 340, 444 A.2d 1199, 1205 (1982).

The suppression testimony presented by the Commonwealth in connection with the manner of the search of the Highway Auto Service on August 2, 1979, is in total and direct conflict with the account provided by the defense. A solid waste manager of the Pennsylvania Department of Environmental Resources testified that he first sought and obtained the permission of Elmo Scatena before any other agents came upon the property and commenced the search. When the manager informed Scatena that he and his agents were looking for boreholes due to the purported existence of explosive fumes in the Butler Mine Tunnel, Scatena allegedly stated: "Sure. Come on ... Do what you want to do." The manager further testified that Elmo Scatena (1) himself waved eleven government agents onto his property; (2) did not indicate that he did not want the agents on his property or at any time request that they leave; and (3) was always cooperative. The manager further stated, and Scatena himself admitted, that Scatena had provided one of the agents with a shovel and had assisted the agents in moving a truck which had been parked directly above the borehole. While the government agents acknowledged that they had conducted prior surveillance of the Highway Auto Service and were, as a result, aware that a waste disposal operation was being conducted upon the premises, the Commonwealth agents maintained that they were looking for the hole in order "to put in ventilation to reduce the concentration of the explosive materials."

Appellant Elmo Scatena testified, on the other hand, that he had no knowledge of the existence of a borehole upon his property and that while he did give permission to certain agents to look over his property on August 1, 1979, he did not consent to their search on August 2. Scatena further testified that four or five government vehicles pulled onto his property, that two or three agents immediately began a search of the area behind the service station and that when he asked the Department of Environmental Resources man-

ager why he and his agents were on his property, the manager was evasive and refused to answer any questions.

The suppression court, in accordance with Pa.R.Crim.P. 323(i), found that appellant Elmo Scatena, after having been advised of the possibility of an explosion and the need to ventilate the mine, "consented to the search which lasted approximately five hours". The court, nevertheless, noted that appellant Elmo Scatena had denied not only that a request for permission to search his business premises had been made, but also that he had consented to any such search. Accordingly, the court proceeded to reduce the issue "to a question of credibility" and to conclude as a matter of law that appellant "knowingly, intelligently and voluntarily" gave his consent to search his premises on August 2.

"It is hornbook law that a warrantless search is valid if made with the consent of the owner or possessor of the premises." *Commonwealth v. West*, 261 Pa.Super. 246, 252–53, 396 A.2d 380, 383 (1978). *See also Commonwealth v. Latshaw*, 481 Pa. 298, 303, 392 A.2d 1301, 1304 (1978), *cert. denied*, 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979). The consent must, of course, be voluntarily given and not the result of duress or coercion, expressed or implied. *Commonwealth v. Hubbard*, 472 Pa. 259, 274–75, 372 A.2d 687, 693–94 (1977); *Commonwealth v. Lapia, supra*, 311 Pa.Super. at 296, 457 A.2d at 894; *Commonwealth v. Lowery*, 305 Pa.Super. 66, 72, 451 A.2d 245, 248 (1982); *Commonwealth v. Morrison*, 275 Pa.Super. 454, 459, 418 A.2d 1378, 1380 (1980), *cert. denied*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981). The voluntariness of consent is a question of fact which must be determined on the basis of the totality of the circumstances in each particular case. *Commonwealth v. Lapia, supra*, 311 Pa.Super. at 296–298, 457 A.2d at 894–95; *Commonwealth v. Morrison, supra*, 275 Pa.Super. at 459–60, 418 A.2d at 1380; *Commonwealth v. Merbah*, 270 Pa.Super. 190, 195, 411 A.2d 244, 247 (1979). Circumstances to be considered in making this determination include "whether the accused

has assisted in the search, and the education and intelligence and experience of the person giving consent." *Commonwealth v. Markman, supra,* 320 Pa.Super. at 313, 467 A.2d at 341. In cases where credibility is in issue, " 'great deference should be given to the decision of the hearing court on the issue of voluntariness, since that court has had the opportunity to observe the appearance and demeanor of the witnesses and the defendant[ ].' " *Commonwealth v. Lapia, supra,* 311 Pa.Super. at 296, 457 A.2d at 894 *quoting Commonwealth v. Richard,* 233 Pa.Super. 254, 261, 336 A.2d 423, 426, *cert. denied sub nom., Santos v. Pennsylvania,* 423 U.S. 1017, 96 S.Ct. 452, 46 L.Ed.2d 389 (1975).

We must, therefore, accept the finding of the suppression court that the evidence of the Commonwealth was credible and that the search of August 2, 1979, was consensual. Appellant was not in custody when permission was allegedly obtained and we are unable to discern evidence of any duress or coercion. The record demonstrates that appellant Elmo Scatena himself assisted the agents in the conduct of the search and that Scatena was a man of sufficient education, experience and business acumen to knowingly, intelligently and voluntarily consent to the search of his premises.[13]

Appellants further contend that the trial court erred by reason of its failure to quash as duplicitous the informations charging in the same count violations of both sections 691.301 and 691.307 of the Clean Streams Law. Appellants assert, therefore, that the informations charged more than one offense in the same count and, as a result, breached

---

**13.** The Commonwealth would, of course, have been far better served if the search had been conducted pursuant to a valid warrant issued upon probable cause. The investigation of the Commonwealth, including surveillance of the subject property, had been conducted for several months prior to the search of the property. As a result, the general method of the unlawful disposal operation as well as the existence of the specific borehole was well known to the investigators. Even though the trial court did not distrust but instead accepted the testimony of the investigators regarding the stated purpose of their inspection and search of the premises, the decision to forego the use of a search warrant was an exercise of dubious judgment.

Pa.R.Crim.P. 228 which provides that "[t]here shall be a separate count for each offense charged."

> The information is, or ought to be, 'the star and compass of a criminal trial,' and 'must be notification to the defendant of the charge he has to meet.' It must be read in a common-sense manner and is not to be construed in an overly technical sense. It is mandatory that the accused be informed thereby of the crime with which he has been charged. Thus, it should contain 'a plain and concise statement of the essential elements of the offense . . .' . . . Pa.R.Crim.P. 225(b).

*Commonwealth v. Baranyai*, 278 Pa.Super. 83, 92–93, 419 A.2d 1368, 1370 (1980). Appellants were not here charged in the same count of their respective informations with different offenses under the Clean Streams Law. Rather, the informations charged that appellants "did willfully or negligently discharge or permit the discharge of industrial wastes directly or indirectly into the waters of the Commonwealth in a manner not authorized by the rules and regulations and without a permit from the Department of Environmental Resources". The informations, when read in a non-technical fashion, informed appellants of the nature of the Clean Streams charges against them. The fact that the informations provided a cross-reference to two sections of the Clean Streams Law could not have hindered appellants in the preparation of their defense since section 691.301 proclaims the general rule against discharge of industrial wastes into the waters of the Commonwealth, while section 691.307 sets forth a more specific version of the general prohibition making it unlawful to discharge industrial wastes into the waters of the Commonwealth without a permit. Moreover, the record makes clear that appellants each received but one sentence for their violations of the Clean Streams Law. This contention is, therefore, rejected.

We also reject the contention that the informations charging appellants with violations of the regulation prohibiting the discharge of waste into mines, 25 Pa.Code § 97.72, offend the mandate of Pa.R.Crim.P. 225(c). Rule 225(c) expressly provides that "[t]he information shall contain the

official or customary citation of the ... provision of law which the defendant is alleged therein to have violated ...." Since the informations clearly alleged that appellants violated the regulation, this contention is meritless.

■ Appellants further contend that the trial judge erred by reason of the admission into evidence of records in connection with the Hudson Oil Refining Company. These records not only served to document trips made by Hudson Oil tanker trucks to the Highway Auto Service, but they also attested to the removal of waste materials from various manufacturing companies by Hudson for disposal at Highway Auto. Appellants argue that the admission of the records by the trial court under the Uniform Business Records as Evidence Act,[14] "denied them their constitutional right of confrontation of witnesses, due process, and a fair trial." We disagree. The Uniform Act provides:

A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.

The trial judge ruled that the business records were competent evidence under the Uniform Act and the court en banc determined that the records were "authenticated as [to] manner of preparation and significance by Hudson employees personally familiar with them". The evidence was properly admitted. As the court en banc opined:

These records contained evidence totally factual in nature: when drivers went to certain places, what they did there, and what purchases they made. They corroborated other evidence that Hudson drivers repeatedly dumped industrial wastes at Highway Auto.

■ Appellants also argue that the trial judge committed an abuse of discretion in failing to grant their motion for a

14. 42 Pa.C.S. § 6108.

mistrial when the Commonwealth, during its cross-examination of a defense expert, sought to elicit by hypothetical question testimony that the cyanide solution detected in the Butler Mine Tunnel would develop into lethal hydrogen cyanide, an explosive gas that is sometimes used in gas chambers.[15] The trial judge denied the defense motion for mistrial and promptly instructed the jury to totally disregard the hypothetical since a substantial fact in connection with the concentration of cyanide was not part of the evidence. "A mistrial is required only when an incident is of such a nature that its unavoidable effect is to deprive appellant of a fair trial. *Commonwealth v. Brown*, 489 Pa. 285, 414 A.2d 70 (1980); *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975). *Commonwealth v. Simon*, 432 Pa. 386, 248 A.2d 289 (1968)." *Commonwealth v. Hernandez*, 498 Pa. 405, 415, 446 A.2d 1268, 1273 (1982). "The grant or refusal of a motion for mistrial generally rests within the sound discretion of the trial court and will not be reversed on appeal in the absence of a flagrant abuse of that discretion." *Commonwealth v. Fields*, 317 Pa.Super. 387, 400, 464 A.2d 375, 382 (1983) (citations omitted). The hypothetical question here posed by the Commonwealth to appellants' chemical expert did not deprive appellants of a fair and impartial trial. The trial judge promptly instructed the jury to totally disregard the hypothetical and thus, the prejudice, if any, did not rise to a level which would mandate the declaration of a mistrial or the subsequent grant of a new trial.

◼ We likewise reject the contention that the trial judge erred when he responded in the affirmative to the following question submitted by the jury to the court during its deliberations:

Is it legally possible for a Defendant to be found guilty of risking a catastrophe, creating a public nuisance, and/or

---

**15.** Appellants, in their brief, set forth five additional claims of error arising from other motions for mistrial which had been made and denied and argue that the cumulative effect of the testimony which prompted these motions served to deny them a fair trial. We have viewed each of these contentions and find no merit in these claims of error either on an individual or collective basis.

criminal conspiracy if we are not able to identify any specific dates on which he was guilty (i.e., not guilty on all dates charged)?

The affirmative supplemental instruction provided by the trial judge, the distinguished Judge Arthur D. Dalessandro, to this question from the jury was correct and we accept the rationale expressed by the court in its en banc opinion:

> The Clean Streams Law violations were listed in separate counts in the informations, each one representing a single incident of dumping into the borehole or discharge into the river. The Commonwealth's evidence on specific dates was circumstantial, although the testimony was virtually uncontradicted that dumping and discharge did occur over the period of time set forth in the informations. In our view, even if the jury had doubts about specific dates for the purpose of reaching a verdict on the Clean Streams Law violations, the evidence nevertheless permitted a finding of guilt on the remaining charges. Thus, the question was properly answered.
>
> Moreover, the verdicts on the Clean Streams Law charges show that defendants were not prejudiced by the affirmative answer. The jury indeed concluded that the Commonwealth proved beyond a reasonable doubt the elements of those offenses, including the dates. Assuming arguendo that the specific dates were also required for the remaining offenses, these verdicts supplied them.

■ It is further asserted that the fines imposed upon appellants were illegally assessed by reason of the failure of the sentencing judge to give proper consideration to the respective capacities and abilities of appellants to pay the fines.[16] During the sentencing hearing, the judge indicated "that the imposition of the fine does not require that the Court consider the Defendants' ability to pay. The fines are absolute and mandatory and therefore they have been imposed as required by law at the minimum." We are of the view, however, that the statute does not clearly man-

---

**16.** Since judgment has been arrested upon the convictions for risking catastrophe, the fines imposed in connection with these convictions must, of course, be vacated.

date that a fine be imposed. The penalty section of the Clean Streams Law, specifically, 35 P.S. § 691.602(b), provides, in part:

> (b) any person ... who wilfully or negligently violates any provision of this act, any rule or regulation of the department, any order of the department, or any condition of any permit issued pursuant to the act is guilty of a misdemeanor of the third degree and upon conviction, shall be subject to a fine of not less than two thousand five hundred dollars ($2,500) ... for each separate offense ....

Section 9726 of the Sentencing Code mandates that when a fine is imposed as an additional sentence "[t]he court shall not sentence a defendant to pay a fine unless it appears of record that ... the defendant is or will be able to pay the fine...." 42 Pa.C.S. § 9726. The Sentencing Code further directs that "[i]n determining the amount and method of payment of fine, the court shall take into account the financial resources of defendant and the nature of the burden that its payment will impose." 42 Pa.C.S. § 9726(d). *See also Commonwealth v. Gaskin,* 325 Pa.Super. 349, 472 A.2d 1154 (1983); *Commonwealth v. Falkenhan,* 306 Pa. Super. 330, 344, 452 A.2d 750, 758 (1982), *cert. denied,* ── U.S. ──, 104 S.Ct. 49, 78 L.Ed.2d 69 (1983). This court has vacated a fine and remanded for further proceedings when the record was inadequate to permit a determination of the ability of an accused to pay the fine imposed. *Commonwealth v. Mead,* 300 Pa.Super. 510, 512, 446 A.2d 971, 973 (1982); *Commonwealth v. Schwartz,* 275 Pa.Super. 112, 118, 418 A.2d 637, 640 (1980).

 We need not remand the instant case for this purpose because the sentencing judge had in his possession sufficient information from which to determine the ability of appellants to pay the fines. The pre-sentence investigation report indicated not only that Elmo Scatena was employed as the owner-operator of Highway Auto Service and in 1981 had reported income from that business of $35,333.00, but also provided a balance sheet with regard to the assets and liabilities of Scatena and his wife as of April 25,

1982. The sentencing judge thus had sufficient financial data from which to determine whether appellant Elmo Scatena had the present or future ability to pay the fines imposed. As to appellants Gerard and Louis Scatena, the presentence investigation report disclosed that neither was married, that they both lived with their parents, that each worked for their father's business and earned $150.00 per week, and that each contributed the sum of $40.00 per week for the household. The statement of financial condition contained in the report further discloses that Louis Scatena had net assets of $5800 and that Gerard Scatena had net assets of $4300. While it would seem that the Scatena brothers did not have the present ability to pay the fines imposed, it appears that the sentencing judge considered both the present and future ability of the Scatenas to pay the fines since the judge (1) observed that a factor in his decision to refrain from the imposition of a term of imprisonment was that a term of probation would afford "a time from within which to work on the payment of the fine", and (2) directed that the Commonwealth complete an arrangement with the brothers for a satisfactory schedule of payments and periodically report to the court concerning the compliance by the brothers with that payment program.[17]

Appellants also assert that the term of imprisonment imposed upon Elmo Scatena for violation of the Clean Streams Law and the regulation prohibiting discharge into mines was excessive. Scatena received concurrent sentences of five and a half months to eleven months on each count charging violation of the Clean Streams Law and concurrent sentences of five and a half months to eleven months on each count charging discharge of waste into mines. The court directed that the sentence for discharging waste was to be served in consecutive fashion to the Clean

17. It is to be noted that if appellants should become unable to pay the fines as imposed, they are not without remedy since Pa.R.Crim.P. 1407 allows appellants to arrange with the court "for payment of the fines ... in such installments and over such a period of time as [the court] deems to be just and practicable, taking into account the financial resources of [appellants] and the nature of the burden its payments will impose...."

Streams Law violations, so that the total term of imprisonment was from eleven months to twenty-two months. A timeless principle of this area of the law is that appellate courts are reluctant to intrude upon the sentencing discretion of the trial court and normally leave the sentence undisturbed, so long as it is within statutory limits,[18] for the reason that the trial court is in a far better position to weigh the factors involved in such a determination. This traditional discretion of the sentencing judge has in recent years been circumscribed by judicial decision, statute and the Rules of Criminal Procedure. This court in *Commonwealth v. Franklin*, 301 Pa.Super. 17, 446 A.2d 1313 (1982), itemized in careful and specific fashion the requirements with which the sentencing judge must now comply. Our examination of the record leads us to conclude that the sentencing judge has complied with all of these requirements and has imposed a sentence that is within the statutorily mandated limit. The term of imprisonment is not, therefore, a provision of the sentence that we will disturb.

 Appellant Elmo Scatena further contends that the sentences imposed upon him for conspiracy to risk catastrophe and for conspiracy to violate the Clean Streams Law violate his constitutional right against double jeopardy. Elmo Scatena was sentenced to a one year term of probation for conspiracy to violate the Clean Streams Law and to a concurrent five year term of probation for conspiracy to risk catastrophe. As a result, appellants argue that Elmo Scatena "is being punished for two crimes when, in fact, he was found guilty of only one." Section 903(c) of the Crimes Code provides:

> **(c) Conspiracy with multiple criminal objectives—**If a person conspires to commit a number of crimes, he is guilty of only one conspiracy so long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship.

18 Pa.C.S. § 903(c). The crimes of which Elmo Scatena had been convicted were "the object of the same agreement or

---

**18.** *See* Subsections .602(b) and .602(d) of the penalties provision of the Clean Streams Law, 35 P.S. § 691.

continuous conspiratorial relationship." Therefore, he may be found guilty of but one charge of conspiracy. *Cf. Commonwealth v. Ivy*, 302 Pa.Super. 114, 122, 448 A.2d 553, 557 (1982); *Commonwealth v. Henderson*, 249 Pa.Super. 472, 482, 378 A.2d 393, 398 (1977). Moreover, pursuant to Section 906 of the Crimes Code, a person may not be convicted of more than one inchoate crime "for conduct designed to commit or to culminate in the commission of the same crime." 18 Pa.C.S. § 906. Accordingly, we vacate the judgments of sentence imposed upon Elmo Scatena for conspiracy to risk catastrophe and for conspiracy to violate the Clean Streams Law and remand for resentencing upon the charge of conspiracy.

Judgments of sentence on all counts of risking catastrophe are reversed and accordingly vacated. Judgments of sentence on all counts of violations of the Clean Streams Law and of discharging waste into mines are affirmed. Judgments of sentence upon appellant Elmo Scatena for conspiracy for risking catastrophe and conspiracy to violate the Clean Streams Law are hereby vacated and the case is remanded for resentencing upon the charge of conspiracy. Jurisdiction is relinquished.