498 A.2d 1314

COMMONWEALTH of Pennsylvania, Appellant,

v.

Elmo SCATENA a/k/a Terry E. Scatena.

COMMONWEALTH of Pennsylvania, Appellant,

v.

Gerard SCATENA a/k/a Jerry Scatena.

COMMONWEALTH of Pennsylvania, Appellant,

v.

Louis SCATENA.

Supreme Court of Pennsylvania.

Argued April 18, 1985.

Decided Sept. 25, 1985.

Keith Welks, Asst. Atty. Gen., K. Douglas Daniel, Harrisburg, for appellant.

William A. DeGillio, Lawrence D. MacDonald, Wilkes-Barre, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

LARSEN,* Justice.

The Commonwealth appeals from the decision of the Superior Court, 332 Pa.Super. 415, 481 A.2d 855 (1984), which reversed the judgments of sentence and vacated appellees' convictions of risking a catastrophe in violation of 18 Pa.C.S.A. § 3302(b).

Following a two-week jury trial in the Court of Common Pleas of Luzerne County, appellees, Elmo Scatena, Gerard Scatena and Louis Scatena[1] were convicted of violating the Pennsylvania Clean Stream Law, 35 P.S. § 691.301, § 691.307 and 25 Pa.Code § 97.72; of causing a public nuisance, 18 Pa.C.S.A. § 6504; and of risking a catastrophe. Elmo Scatena was also convicted of conspiracy, 18 Pa.C.S.A. § 903(a). The trial court arrested judgment on the convictions for causing a public nuisance. The appellees were sentenced on all other convictions.[2]

---

* This case was reassigned to this author on May 28, 1985.

1. Elmo Scatena is the father of Gerard and Louis Scatena.

2. Elmo Scatena was sentenced to serve a total term of imprisonment of from eleven months to twenty-two months and to pay a total fine of $195,000.00 for violations of the Clean Streams Law and 25 Pa.Code § 97.72, a regulation prohibiting the discharge of waste into mines. He was also sentenced to a one year term of probation for conspiracy to violate the Clean Stream Law and to a concurrent 5 year term of probation for conspiracy to risk a catastrophe, as well as a five year concurrent term of probation and a $5,000.00 fine upon the crime of risking a catastrophe. Gerard and Louis Scatena were each sentenced to four years of probation and each fined $127,500.00 for violations of the Clean Streams Law and the discharge regulation. Further, each was sentenced to consecutive one year terms of probation and fines of $2,500 upon the crime of risking a catastrophe.

The Superior Court affirmed the judgments of sentence for violations of the Clean Stream Law and for conspiracy.[3] The judgments of sentence for risking a catastrophe were reversed, that court holding there was insufficient evidence to sustain these convictions. The sole issue before us is whether there was sufficient evidence to support the appellees' convictions of risking a catastrophe.[4] We hold the evidence was sufficient and reverse.

The testimony and evidence produced at trial established the following: Appellee Elmo Scatena owned and operated a garage and automotive service station known as Highway Auto Service in Pittston, Luzerne County, Pennsylvania. He was assisted in the operation of the business by his two sons, appellees Gerard Scatena and Louis Scatena. From August of 1978 to July of 1979, the appellees knowingly discharged hundreds of thousands of gallons of untreated industrial and chemical wastes into a borehole on the Highway Auto Service premises. The borehole led to an abandoned underground mine where the wastes accumulated. The appellees at first were paid $150.00 and then later $200.00 for each truckload of wastes dumped into the borehole.

Much of the wastes discharged into the borehole consisted of oily sludges and cutting solutions. A substantial portion of these materials were contaminated with metallic chips of iron, chrome, nickel and copper hydroxides. Other wastes deposited into the abandoned mine were more chemical in nature. Some contained sodium methacyrlate, sodium chlorine, sodium sulfate, hydroquinone and pyrogallic acids.[5] In addition, at least 66,000 gallons of waste cyanide were dumped into the borehole between August of 1978 and

3. The judgment of sentence for conspiracy applied only to Elmo Scatena since he was the sole appellee convicted of that offense.

4. The parties here cross-petitioned for allowance of appeal. We denied the petition filed by the Scatenas and granted the Commonwealth's petition.

5. According to the testimony, these waste materials were a dark brown liquid, very high in Ph, making them acutely alkaline and caustic.

January of 1979. This avalanche of waste materials deposited into the borehole collected and amassed in the abandoned underground mine stretching below the populated Pittston area. On July 29, 1979, this accumulation of hazardous materials escaped from the mine and a massive volume of black, sludgy, odorous, toxic wastes commenced to discharge into the Susquehanna River. The Susquehanna River is a major waterway in the Luzerne County area serving the population in many significant ways. One of those ways is that it provides raw water intake for the water authority of Danville, Pennsylvania.

The waste discharging into the river was discovered at once by the authorities. On July 30, 1979, the Pennsylvania Department of Environmental Resources (D.E.R.) initiated massive containment measures to control the discharge. Nonetheless, by mid-day on July 31, 1979, the Susquehanna River was polluted with a bank to bank oil sheen for a distance of 35 miles down river from the point of discharge. Additionally, there were oily patches extending for another 25 to 30 miles downstream to Danville.

On August 8, 1979, the Commonwealth performed a rhodamine-wt dye test by pouring 2 to 2-½ gallons of the dye into the borehole on the Highway Auto premises. The dye was flushed with 1000 gallons of water. Less than 24 hours later the dye had made its way through the mine and into the river. Three days later, measurements revealed that 60.5% of the dye dumped into the appellees' borehole had issued from the mine.

Numerous soil samples taken from near the borehole, within the borehole and at the mine tunnel were analyzed by the D.E.R. All of the samples revealed the presence of the chemical dichlorobenzene.[6] In addition, samples taken five days after the discharge began revealed the presence of dichlorobenzene in the raw water intake and the finished water of the Danville Water Company. This same chemical

---

6. A chemist who testified on behalf of the appellees admitted on cross-examination that dichlorobenzene was bioaccumulative and could cause liver and kidney damage in humans.

was also found in the kitchen sink tap water of a Danville restaurant.

By and large the prodigious containment efforts undertaken by the Commonwealth were successful in controlling the discharge. Nevertheless, measurable amounts of discharge continued for several months. There was also evidence presented concerning: (a) the potentially explosive gases that were escaping from the mine tunnel, and (b) the presence of the chemical cyanide which when coupled with the environment of an underground mine evolves into hydrogen cyanide which has the potential to be released as a deadly gas and disperse in all directions including up and out of holes in the ground.[7]

The Commonwealth argues that the evidence presented at trial was sufficient to convince beyond a reasonable doubt that the appellees' actions in discharging untreated industrial and chemical wastes into the borehole and abandoned mine which eventually exited into the Susquehanna River risked a catastrophe in violation of 18 Pa.C.S.A. § 3302(b).

Section 3302(b) of the Crimes Code provides:

**Risking a catastrophe.**—A person is guilty of a felony of the third degree if he recklessly creates a risk of catastrophe in the employment of fire, explosives or other dangerous means listed in subsection (a) of this section.

18 Pa.C.S.A. 3302(b). Subsection (a) enumerates "other dangerous means" as "flood, avalanche, collapse of building, release of poison gas, radioactive material or other harmful or destructive force or substance, or by any other means of causing potentially widespread injury or damage." 18 Pa.C.S.A. 3302(a).

In *Commonwealth v. Hughes*, 468 Pa. 502, 364 A.2d 306 (1976) we had occasion to consider this statute and we said:

Section 3302 attempts to meet two separate and distinct societal harms. In paragraph (a) it purports to punish *for the damage caused* by the mishandling of certain enu-

7. There was testimony that there were a considerable number of boreholes in the Pittston area.

merated highly dangerous forces or substances. Paragraph (b) addresses the *exposure to harm* created by the misuse of these forces or substances.

In the instant case, the Commonwealth sought to establish that appellees *exposed society to harm* and risked a catastrophe by the dumping of huge quantities of dangerous wastes into the borehole on the Highway Auto Service property in violation of paragraph (b) of Section 3302. The Commonwealth offered proof that society was subjected to the risk of "widespread injury or damage" in three particular ways. First, by the creation of a danger of an underground mine explosion in an area honeycombed with mines; second, by the generation and potential release of poisonous cyanide gas from the abandoned mine; and third, by the discharge of hazardous chemicals and industrial wastes into the Susquehanna River. The Superior Court reviewed the evidence presented in this case and concluded that it was insufficient as to each of these threats.

Where the sufficiency of the evidence to support a guilty verdict is challenged on appeal:

> [w]e must view the evidence in the light most favorable to the Commonwealth as verdict winner, accept as true all the evidence and all reasonable inferences upon which, if believed, the jury could properly have based its verdict, and determine whether such evidence and inferences are sufficient in law to prove guilt beyond a reasonable doubt. (*Commonwealth v. Stockard,* 489 Pa. 209, 413 A.2d 1088 (1980).

*Commonwealth v. Coccioletti,* 493 Pa. 103, 107, 425 A.2d 387, 389 (1981). *See Commonwealth v. Tribble,* 502 Pa. 619, 467 A.2d 1130 (1983).

 Applying this standard to the entire record in the present case, we hold that the evidence was sufficient to support appellees' convictions of risking a catastrophe. The pollution of a major public water source resulting from the discharge of enormous quantities of hazardous industrial wastes and dangerous chemicals into that source, in this case the Susquehanna River, is enough to establish a viola-

tion of Section 3302(b). The theory of the Commonwealth's case as well as the thrust of its proof was that the appellees *risked a catastrophe* as opposed to caused a catastrophe. The fact that swift and effective governmental intervention limited the deleterious effect of appellees' reckless conduct does not decriminalize their actions. The fact that an actual devastating catastrophe was averted is of no moment in assessing appellees' conduct in terms of Section 3302(b)— exposing society to widespread damage.[8] The massive discharge of dangerous wastes into the Susquehanna River which, in spite of immediate detection and vast and expeditious containment measures, within two days, contaminated the water way for some 60 miles downstream is conduct that risks a catastrophe.

> [T]he degree of culpability required by Section 3302(b) is ...; a *gross reviation* from the standard of conduct that a reasonable person would observe in the actor's situation. The 'risk' proscribed by this legislation is the use of dangerous means by one who 'consciously disregards a substantial and unjustifiable risk' and thereby *unnecessarily* exposes society to an extraordinary disaster. (Emphasis in original)

*Commonwealth v. Hughes,* 468 Pa. at 513, 364 A.2d at 311.

The conduct of the appellees in this case of depositing immense quantities of dangerous untreated industrial and chemical wastes into the Susquehanna River exhibits a conscious disregard of the very substantial and unjustifiable risk involved to human health and to the environment.[9] These abusive actions constituted a gross deviation from

---

**8.** In *Commonwealth v. Hughes, supra* we said that in construing Section 3302(b) "in accordance with the fair import of its terms the word 'catastrophe' is intended to be synonymous with 'widespread injury or damage.'"

**9.** The substances deposited into the mine and eventually the river included cyanide, dichlorobenzene, napthalene, waste oil, trichloroethylene, tetrachloroethylene, zylenes, straight-chained alkanes, substituted benzine, napthalene, methylnapthalenes, dimethynapthalene, acenaphthene, methlacenapthalene, phenolic material, polynuclear aeromatic moleculor weight 178, phenanthrene, anthracene, polynuclear aeromatic moleculor weight 202 dioccylphthalate or diethyl hexyl phthalate.

the standard of conduct that reasonable businessmen and property owners would observe in the same circumstances as the appellees. Society was caused to be unnecessarily exposed to the extraordinary disaster of having a major water source in a populated area turned into a polluted health hazard. We reject the appellees' argument that because the Commonwealth failed to present expert testimony relating to the precise degrees of toxicity of the various chemicals and wastes deposited into the river, the evidence falls short of proof of risking a catastrophe.

When a school bus driver intentionally navigates his bus full of school children through a red light at a high rate of speed and miraculously escapes collision and injuries, no expert testimony is needed to establish that the driver is guilty of risking a catastrophe. When a pyromaniac sets fire to an office building which is then occupied by thousands of workers and the fire is extinguished before any humans have been consumed by the flames, no expert testimony is needed to establish that the arsonist is guilty of risking a catastrophe.

Likewise, when polluters cause massive quantities of untreated and hazardous industrial and chemical wastes to be discharged into one of the Commonwealth's major rivers resulting in the river being covered solidly from bank to bank for thirty-five miles with an oil sheen and then for another thirty miles there were patches of oily substance on the water, and the discharge consisted of numerous substances harmful to human health and was only contained by the herculean efforts of the D.E.R., no expert testimony as to the exact toxic levels of the wastes is needed to establish that the pollutors (appellees herein) are guilty of risking a catastrophe.[10]

10. Because we find that the evidence of the reckless pollution of the Susquehanna River was sufficient to convict the appellees of risking a catastrophe, it is unnecessary for us to consider whether the evidence of the other risks, namely, the danger of an underground explosion and the potential release of cyanide gas from the mine, was adequate to support conviction.

The order of the Superior Court is reversed and the judgments of sentence are reinstated.

FLAHERTY, J., filed a dissenting opinion in which NIX, C.J., and ZAPPALA, J., joined.

FLAHERTY, Justice, dissenting.

I dissent. It is axiomatic that a criminal conviction may not stand unless every element of the crime has been established beyond a reasonable doubt. One of the elements of the crime of risking a catastrophe, 18 Pa.C.S.A. § 3302 (b), is the showing, beyond a reasonable doubt, that a catastrophe, or "widespread injury or damage," *Commonwealth v. Hughes*, 468 Pa. 502, 512, 364 A.2d 306, 312 (1976) was risked. The Commonwealth did not show that the Scatena's acts, outrageous though they were, actually put the public in jeopardy of widespread injury or damage. Therefore, the conviction should not stand.

The fundamental error underlying the majority's view is the same as that underlying the prosecutor's view: viz., the erroneous belief that placement in public waters of large volumes of industrial contaminants constitutes, *per se*, the risk of catastrophe. This view is simply wrong. That it is so can be discerned from the *Hughes* case, supra, the only prior case in which this Court have substantively dealt with the statute in question, where "catastrophe" is discussed and defined. In *Hughes* this Court noted that criminal statutes should be interpreted according to the fair import of their terms, and when statutory language is ambiguous, they shall be interpreted so as to further the general purposes of the provision involved. The *Hughes* Court then turned to the Comment to the Model Penal Code to elucidate the purpose of our statute:

> "This section introduces a new concept in Anglo-American penal law. It is patterned on European legislation dealing with activity creating a "common danger." Fire, dealt with by the law of arson, is the prototype of forces which the ordinary man knows must be used with special caution because of the poten-

tial for wide devastation. Modern legislation puts explosion, flood, poison gas, and avalanche in the same category, and modern technological development alerts us to possibilities of catastrophe in mishandling radioactive material." (Footnote omitted).

It is thus apparent that the legislature recognizing the catastrophic effects that can result from the reckless use of the enumerated forces or substances determined to punish under Section 3302 (b), those who would expose the public to an unreasonable risk because of their reckless handling *of these forces or substances.*

468 Pa. at 511–512, 364 A.2d at 306. (Emphasis added). The Comment to the Model Penal Code specifically mentions fire, explosion, flood, poison gas, avalanche, and possibly the handling of radioactive material as activities which, common knowledge tells us, may cause widespread devastation. It is noteworthy that the pollution of waters with industrial chemicals is not included in this list.

More fundamentally, however, virtually no hazard may be included in the list absolutely, even those mentioned in the Comment. Tossing a lighted match on the polished marble floor of a modern skyscraper, for example, is certainly an irresponsible act, and possibly even a criminal act, but without more, it cannot be said to risk a catastrophe. If the match burns, goes out, and is surrounded by 100 square feet of nonflammable marble floor, with no other flammable materials nearby, whatever other state or local regulations and statutes may have been violated, it cannot be said that the actor risked a catastrophe. On the other hand, if the Commonwealth were able to introduce evidence in this hypothetical case that the carelessly tossed match might in fact have ignited some sort of flammable material present in the lobby of the skyscraper, and that a conflagration might have resulted, then a prima facie case of risking a catastrophe would have been made out.

This hypothetical example is illustrative of the error in the majority opinion. It is not the case that every carelessly tossed match risks catastrophe, that every careless act

while driving a school bus risks widespread damage or injury, or that every dumping of industrial waste into the waterways risks the harm contemplated by the statute. On the other hand, some acts, such as those which occurred in the *Hughes* case, are self-evidently catastrophic in nature when they occur. In *Hughes* an employee of a company which used flammable solvents in the manufacturing process, while carrying a five gallon container of the solvent, spilled a half gallon of the solvent on the floor and then, in violation of a company rule against smoking, lit a cigarette and threw a match on the floor. The spilled solvent ignited and an eight alarm fire resulted in which two lives were lost and extensive property damage occurred. This Court agreed that such conduct constituted risking a catastrophe and affirmed the conviction for risking a catastrophe:

> While the section [3302(b)] does not enumerate those circumstances under which an unreasonable risk of injury or damage would exist, we do not believe such precision is required. Given the volatile nature of the substance here involved, the repeated warnings against the use of matches in the area and the obvious possible consequences of ignoring these precautions, it is clear that a person in the situation of the appellee should have been fully aware that his conduct was proscribed by the provisions of this section.

*Id.*, 468 Pa. at 513–154, 364 A.2d at 311–312. The *Hughes* case, like all cases, is to be read within its context. Generally, the case may be said to stand for the proposition that when a person willfully behaves in a manner which an ordinary person would recognize as risking foreseeable widespread injury, this behavior amounts to risking a catastrophe. Lighting a match in an area containing large amounts of flammable solvent and throwing the match on the floor where solvent had been spilled would surely constitute risking a catastrophe.

But in the case at bar, unlike the *Hughes* case, the foreseeable harm is not so clear. It may be presumed that an ordinary person would recognize that pouring large

quantities of industrial waste down a borehole might possibly cause some harm, but the nature or extent of the harm would surely not be known. It might, or it might not, be a catastrophe that was risked. Even that uncertainty, however, would not prevent a conviction for risking a catastrophe in the *Scatena* case if, after the act were committed and harm did result, the Commonwealth showed by competent evidence that the harm which resulted, if it had not been mitigated by the very commendable efforts of the DER and others, would have resulted in a catastrophe.

Unfortunately, the Commonwealth established no such evidence. Incredible as it seems, there was not even any evidence of record which established that a single fish or waterfowl was killed or injured as a consequence of the acts of the Scatenas, and we simply do not know what would have happened if the DER had not intervened. It is possible that the Danville water system would have filtered out virtually all of the harmful materials. But even if the system would have failed and Danville would have been without water for a period of time, there was no evidence as to whether that would have been a catastrophe. The majority notes that the compound dichlorobenzene was found in the Danville water supply even after the containment efforts were in effect, but there was no evidence to establish that the concentrations in which it was present were harmful or that the bioaccumulative properties of dichlorobenzene were likely to lead to the statutorily required widespread injury.

It may well be that if the DER had not intervened, the Danville water system would have failed and absolute disaster would have occurred. It is also conceivable that a large number of persons ingested the water containing small amounts of dichlorobenzene, and that these persons could have been irreversibly harmed. If these hypothetical facts had been established at trial by competent evidence, certainly a conviction for risking catastrophe would be justified. But in the case before us, no such evidence has been offered and it should be apparent that the majority's at-

tempt to establish a *per se* rule that anyone who dumps industrial waste into the waterways of the Commonwealth has risked a catastrophe simply will not withstand analysis. If a person is to be convicted of the crime of risking a catastrophe, the Commonwealth, at a minimum, must be able to show that the act which the actor committed was capable of causing widespread injury. That was not shown in this case.*

* Although the majority does not discuss the totality of the Commonwealth's case on risking a catastrophe, the Commonwealth's theories of the case were that the Scatenas had risked catastrophe by producing one or more of the following perils: (1) the danger of explosion within the underground workings of the Butler Mine Tunnel; (2) the generation and possible release of poisonous cyanide gas from within the abandoned mine; and (3) the discharge of dangerous chemicals into the Susquehanna River.

As the foregoing discussion has indicated, the Commonwealth failed to establish that a catastrophe might have resulted from the discharge of chemicals into the river. The other Commonwealth arguments are also without merit.

As to the Commonwealth's assertion that it established the danger of explosion within the underground workings of the mine, there is no evidence to support this claim. The Commonwealth's expert witnesses testified that in two separate measurements of explosivity at the Butler Mine Tunnel, the level of explosivity was only approximately 30% of that required for an explosive atmosphere. Furthermore, there was no evidence at all on the potential damage of an underground explosion. It is possible, without evidence of record to the contrary, that an underground explosion would not have posed dangers to anyone. Since it was the Commonwealth's theory that the inner workings of the mine contained an explosive atmosphere and that there was a danger to the public because of this, the Commonwealth should have introduced such evidence by way of expert witnesses and hypothetical questions.

The attorney for the Commonwealth, at the close of the stated: I believe that Mr. Vincinelly [Commissioner of Deep Mine Safety, Department of Environmental Resources] and Mr. Meyer [a private consultant working for the Department of Environmental Resources] both indicated that there was combustible gasses coming out of that tunnel when they arrived there and Mr. Vincinelly *did not express his opinion as to what would have gone on further up the tunnel* but their opinions were limited to the mouth of the tunnel and what was occurring there; that there was a thirty per cent level of gasses at this point.

N.T. 1446. (Emphasis supplied). Although the Commonwealth's theory was that explosive concentrations of gas existed "further up the tunnel," the attorney for the Commonwealth did not introduce any evidence to this effect. As defense counsel later stated when he demurred to the evidence, "[I]f we take all of the evidence of the

It is understandable that anyone who reads the facts of this case would be outraged by the criminal, thoughtless, and irresponsible acts of the Scatenas. It would be understatement to say that persons who act as the Scatenas did

Commonwealth it shows just the opposite, that there was no danger." N.T. 1448. Defense counsel's assessment of the evidence is correct.

As to the second Commonwealth assertion, that there was evidence of the presence of poisonous cyanide gas in the mine, this contention also is without merit. The evidence establishes that cyanide gas probably was present in the mine, but nowhere is it established that the concentration of cyanide gas was lethal.

The Commonwealth's evidence established that cyanide dissolved in water was present in the Butler Mine Tunnel outflow at levels of .31 to .02 milligrams per liter, or .31 to .02 parts per million. A defense expert testified that cyanide gas which would be formed by this concentration of cyanide dissolved in water would be 1.2 parts per million and that this is well within the maximum safe level for cyanide gas in industrial workplaces as determined by OSHA at 4 parts per million.

On cross examination, the Commonwealth established that when industrial waste cyanide was poured into acid minewater, hydrogen cyanide, or cyanide gas would be formed. It also established that, in principle, pouring cyanide liquid into an acid solution is how cyanide gas is formed in gas chambers.

However, when the Commonwealth posed a hypothetical question as to what would happen when 5,500 gallons of a 5% solution of cyanide was mixed with minewater having a pH factor of 4, the question and answer were properly stricken because there was nothing in evidence that a 5% cyanide concentration was in the case. Moreover, there was no other evidence of the strength of cyanide gas that would be formed in the mine by the dumping of industrial waste, except evidence from a defense expert that no significant toxic amounts of cyanide gas would be produced from the concentrations of cyanide that were in evidence.

Furthermore, it was not established how this gas, assuming it to exist in lethal quantity, would cause a catastrophe. Although it was stated that cyanide gas is slightly lighter than other gases and would rise, possibly through boreholes, it was not established how this rising gas might cause what the *Hughes* case termed "widespread injury or damage." There was no evidence of record as to how many holes the gas might rise through, where these holes were located, or how the gas would be dispersed from the holes in such a way that widespread injury or damage might occur. Rather, what the Commonwealth established was that it was *conceivable* that lethal cyanide gas might escape from boreholes and cause localized injury.

Thus, the Commonwealth failed to produce the requisite evidence in any of these three areas which would establish beyond a reasonable doubt that the Scatenas risked a catastrophe. It may well be that a catastrophe was risked, but if it was, it is the prosecutor's duty to establish beyond a reasonable doubt that the risk was present. This he did not do.

in this case are burdens, not assets to society and that they should be punished to the full extent of the law. And they have been so punished. Apart from the conviction for risking a catastrophe, Elmo Scatena has been sentenced to a jail term and fines of almost $200,000 for violation of the Clean Streams Law and of regulations prohibiting the discharge of waste into mines. His sons have been sentenced to a term of probation and each has been fined $127,500 for violations of the Clean Streams Law and the discharge regulations. It may well be that even these penalties are inadequate social responses to the criminal acts committed by the Scatenas, but if that is true, it is the business of the legislature, not of this Court to redress that deficiency. It is our responsibility and it has been this Court's long and distinguished tradition to safeguard the due process rights of *all* citizens of this Commonwealth by requiring that criminal convictions may not stand unless they are grounded on the firmament of competent legal evidence which establishes beyond any reasonable doubt every element of the crime as charged. Such evidence has not been presented in this case and the conviction of risking a catastrophe should be reversed.

NIX, C.J., and ZAPPALA, J., joins this dissenting opinion.