531 A.2d 459

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Paul LUDWIG, Appellant.**

Superior Court of Pennsylvania.

Argued March 9, 1987.

Filed Sept. 8, 1987.

William K. Sayer, Assistant Public Defender, Stroudsburg, for appellant.

E. David Christine, Jr., Assistant District Attorney, E. Stroudsburg, for Com., appellee.

Before CIRILLO, President Judge, and BROSKY, WIEAND, OLSZEWSKI, DEL SOLE, MONTEMURO, TAMILIA, POPOVICH and JOHNSON, JJ.

WIEAND, Judge:

The significant issue in this appeal is whether the constitutional right of confrontation is violated when a child abuse victim is permitted to testify against his or her alleged abuser via closed circuit television.

On August 9, 1984, Paul Ludwig was arrested and charged with sexually abusing his six year old daughter. A preliminary hearing was held on August 28, 1984. Prior to the start of the hearing the victim was interviewed by the assistant district attorney and was able to discuss the details of the abuse in a manner which was consistent with prior reports which she had given. When she was called upon to give testimony at the preliminary hearing, however, the child froze emotionally and was unable to testify in the presence of her father. The preliminary hearing was continued, and leave of court was obtained to present the

child's testimony via closed circuit television. At trial, the child was also permitted to testify via closed circuit television. By this procedure, the child was able to give testimony in a separate room, from where her testimony was captured and transmitted by closed circuit television to the courtroom. Thus, the defendant was able to observe the witness fully as she testified, and his right of cross-examination was preserved inviolate. The jury, moreover, was able to observe the witness fully as she answered questions put to her during direct and cross-examination. The only difference between the procedure adopted by the trial court in this case and the customary means of receiving testimony from a witness in a courtroom was that the child victim was situated in a separate room and was not required to look at the defendant as she testified.

■ Ludwig was found guilty of rape,[1] involuntary deviate sexual intercourse,[2] incest,[3] corruption of minors,[4] and endangering the welfare of a child.[5] Post-trial motions were denied; Ludwig was sentenced; and this direct appeal followed. Ludwig's primary contention on appeal is that the right to confront his accuser, as guaranteed by the United States and Pennsylvania Constitutions, was violated when his accuser was permitted to testify at trial via closed circuit television. We reject this argument.[6]

■ The Sixth Amendment of the Constitution of the United States provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with

1. 18 Pa.C.S. § 3121.
2. 18 Pa.C.S. § 3123.
3. 18 Pa.C.S. § 4302.
4. 18 Pa.C.S. § 6301.
5. 18 Pa.C.S. § 4304.
6. An examination of the remaining issues raised by appellant suggests a lack of merit therein. The evidence was sufficient to sustain the guilty findings; appellant is not entitled to be discharged on Rule 1100 grounds; the child was not rendered incompetent because of age alone; and neither the trial court's evidentiary rulings nor its jury instructions require the granting of a new trial. Moreover, the offenses of rape and involuntary deviate sexual intercourse did not merge for sentencing purposes.

the witnesses against him...." Similarly, the Pennsylvania Constitution, in Article 1, § 9, guarantees a person accused in a criminal prosecution the right "to meet witnesses face to face." Confrontation " '(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever discovered for the discovery of truth"; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness making his statement, thus aiding the jury in assessing his credibility.' " *Lee v. Illinois*, 476 U.S. 530, 540, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514, 526 (1986), quoting *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489, 497 (1970) (footnote omitted).

In *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Supreme Court explained the purpose for confrontation as follows:

> "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers." ... 5 *J. Wigmore, Evidence*, § 1395, p. 123 (3rd ed. 1940).

*Id.* at 315–316, 94 S.Ct. at 1110, 39 L.Ed.2d at 353 (emphasis omitted). See also: *California v. Green, supra* 399 U.S. at 166, 90 S.Ct. at 1939, 26 L.Ed.2d at 501 ("[T]he right of cross-examination ... provides substantial compliance with the purposes behind the confrontation requirement."). A secondary purpose of the confrontation clause is that:

> the judge and the jury are enabled to obtain the elusive and incommunicable evidence of a witness' deportment while testifying, and a certain subjective moral effect is produced upon the witness.... This secondary advan-

tage, however, does not arise from the confrontation of the opponent and the witness; it is not the consequence of those two being brought face to face. It is the witness' presence before the tribunal that secures the secondary advantage....

5 J. Wigmore, *Evidence,* § 1395 at 153–154 (Chadbourn rev. 1974). See: *Mattox v. United States,* 156 U.S. 237, 242–244, 15 S.Ct. 337, 339–340, 39 L.Ed. 409, 411 (1895); *United States v. Caputo,* 758 F.2d 944, 950 (3d Cir.1985).

The Supreme Court of the United States has said that while the Sixth Amendment reflects a preference for a face to face confrontation at trial, the preference is not absolute and inelastic. On the contrary, the confrontation clause permits several well recognized exceptions. For example, the confrontation clause of the United States Constitution does not preclude the use of hearsay evidence in criminal trials under circumstances which otherwise render such evidence reliable, i.e., where it bears sufficient "indicia of reliability." *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980) (involving former testimony of unavailable witness). See: *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986) (statement of co-conspirator); *Ohio v. Roberts, supra* (former testimony); *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (statement of co-conspirator); *Mattox v. United States, supra* (former testimony); *Williams v. Melton,* 733 F.2d 1492 (11th Cir.) (out-of-court statements of witnesses falling under res gestae exception), *cert. denied,* 469 U.S. 1073, 105 S.Ct. 567, 83 L.Ed.2d 508 (1984); *Haggins v. Warden,* 715 F.2d 1050 (6th Cir.1983) (excited utterance), *cert. denied,* 464 U.S. 1071, 104 S.Ct. 980, 79 L.Ed.2d 217 (1984); *United States v. Peacock,* 654 F.2d 339 (5th Cir.1981) (statement of co-conspirator), *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983).

Similarly, appellate courts in Pennsylvania have held that "[t]he Pennsylvania Constitution guarantees an accused the right to confront and cross-examine witnesses." *Commonwealth v. McCloud,* 457 Pa. 310, 311, 322 A.2d 653, 655

(1974). See also: *Commonwealth v. Coldsmith*, 176 Pa.Super. 283, 286, 106 A.2d 649, 650 (1954) ("The right 'to meet the witnesses face to face' is intended to secure the right of cross-examination."). "Although a fundamental right, this right of confrontation is not absolute." *Commonwealth v. McCloud, supra* 457 Pa. at 312, 322 A.2d at 655. Thus, the right of confrontation does not prevent the use of videotape depositions of a witness who is unavailable for trial, where the depositions were taken in the presence of the accused and the witness was subjected to cross-examination. *Commonwealth v. Stasko*, 471 Pa. 373, 370 A.2d 350 (1977). Similarly, because the right of confrontation is not absolute, certain hearsay evidence has been held admissible when supported by sufficient indicia of reliability. See: *Commonwealth v. Thomas*, 443 Pa. 234, 279 A.2d 20 (1971). See also: *Commonwealth v. Pinkins*, 514 Pa. 418, 525 A.2d 1189 (1987) (statement made by co-conspirator during course of conspiracy); *Commonwealth v. Dreibelbis*, 493 Pa. 466, 426 A.2d 1111 (1981) (same); *Commonwealth v. Ehrsam*, 355 Pa.Super. 40, 512 A.2d 1199 (1986) (excited utterance). So also, business records, if properly verified, are admissible against an accused even though he does not have the right to confront the person who was the source of the information therein contained. See: *Commonwealth v. Scatena*, 332 Pa.Super. 415, 438, 481 A.2d 855, 866–867 (1984), *rev'd on unrelated grounds*, 508 Pa. 512, 498 A.2d 1314 (1985). Public records have also been held admissible under certain circumstances without violating the confrontation clause of the Pennsylvania Constitution. See: *Commonwealth v. Coldsmith, supra.* And finally, testimony of witnesses who are deceased or otherwise unavailable may be received if given at a prior trial where the witness was subjected to cross-examination. See: *Commonwealth v. Rodgers*, 472 Pa. 435, 372 A.2d 771 (1977); *Commonwealth v. Jones*, 344 Pa.Super. 420, 496 A.2d 1177 (1985). These decisions disclose that the courts of this Commonwealth have never embraced the view that the right of confrontation unconditionally mandates that all witnesses offering

evidence against an accused be required to testify in his presence or confront him eyeball to eyeball.

The courts in other jurisdictions have also rejected such a restrictive view. In *State v. Sheppard*, 197 N.J.Super. 411, 484 A.2d 1330 (1984), the New Jersey Superior Court upheld the use of videotape testimony by a ten year old sexual abuse victim against her alleged abuser. In concluding that the use of videotaped testimony had not violated the accused's right of confrontation, the Court said:

> The Confrontation Clause is not implacable in its demands. Nearly every authority agrees that it is subject to exceptions. In reaching the conclusion, as this court has, that the use of videotaped testimony in this case of child abuse is permissible, it is accepted as a fact that only a modest erosion of the clause, if any, will take place. The child, through the use of video, will not be obliged to see the defendant or to be exposed to the usual courtroom atmosphere. Nevertheless, the defendant as well as the judge, the jury, and the spectators, will see and hear her clearly. Adequate opportunity for cross-examination will be provided. This is enough to satisfy the demands of the confrontation clause. If it is not, it represents a deserved exception.... Everything but "eyeball-to-eyeball" confrontation will be provided. No case has held eye contact to be a requirement. It is not demanded when a witness "confronts" a defendant in the courtroom. No court rule requires eye contact and courtroom distances sometimes make such contact impossible.

*Id.* at 432, 484 A.2d at 1342–1343.

In *Commonwealth v. Willis*, 716 S.W.2d 224 (Ky.1986) the Supreme Court of Kentucky upheld the constitutionality of a statute which permitted the use of television cameras in presenting the testimony of child victims of sexual abuse. The Court observed that the confrontation clause contained in the Kentucky constitution, like that contained in the Pennsylvania constitution, guaranteed to a defendant the right to meet witnesses "face to face." The Court held that the right guaranteed by the Kentucky Constitution did not

exceed the right of confrontation guaranteed by the federal constitution. The Court said:

> *There is no constitutional right to eyeball to eyeball confrontation.* The choice of the words "face to face" may have resulted from an inability to foresee technological developments permitting cross-examination and confrontation without physical presence.
>
> In the Eighteenth and Nineteenth Centuries, live testimony was the only way that a jury could observe the demeanor of a witness. The use of video tapes does not represent a significant departure from that tradition because the goal of providing a view of the witness's demeanor to the jury is still achieved.
>
> *The intervention of a video screen or a one-way mirror does not infringe upon the defendant's right to confrontation. There is a difference between confrontation and intimidation.* It would be unconstitutional for the government to take evidence in secret and outside of the presence of the defendant, but there is no right to eyeball to eyeball presence.

*Id.* at 230–231. (emphasis added). Other cases upholding the use of videotaped testimony of a child victim despite constitutional or statutory provisions guaranteeing the right "to meet witnesses face to face" include *People v. Johnson,* 146 Ill.App.3d 640, 100 Ill.Dec. 330, 497 N.E.2d 308 (1986), and *State v. Cooper,* 291 S.Ct. 351, 353 S.E.2d 451 (1987). Indeed, those courts which have considered the use of alternative courtroom procedures to shield a child witness from the traumatic effects of testifying within the physical presence of his or her abuser have almost uniformly found no violation of confrontational guarantees. See: *In re Appeal in Pinal County Juvenile Action Nos. J–1123 & J–1124,* 147 Ariz. 302, 709 P.2d 1361 (App.1985); *Hochheiser v. Superior Court,* 161 Cal.App.3d 777, 208 Cal.Rptr. 273 (1984); *Chambers v. State,* 504 So.2d 476 (Fla.Ct.App.1987); *Altmeyer v. State,* 496 N.E.2d 1328 (Ind. App.1986); *State v. Strable,* 313 N.W.2d 497 (Iowa 1981); *State v. Johnson,* 240 Kan. 326, 729 P.2d 1169 (1986); *State*

*v. Warford,* 223 Neb. 368, 389 N.W.2d 575 (1986); *State v. Tafoya,* 105 N.M. 117, 729 P.2d 1371 (Ct.App.1986); *State v. Vigil,* 103 N.M. 583, 711 P.2d 28 (Ct.App.1985); *People v. Henderson,* 132 Misc.2d 51, 503 N.Y.S.2d 238 (1986); *People v. Algarin,* 129 Misc.2d 1016, 498 N.Y.S.2d 977 (1986). See also: *ABA Guidelines for the Fair Treatment of Child Witnesses in Cases Where Child Abuse is Alleged,* Guideline No. 3(g) (1985).

The decided cases teach that the right of confrontation occasionally may be required to give way to considerations of public policy and the necessities of a case. A limitation can be placed on the right of confrontation, however, only where it is necessary because of a compelling interest; and any infringement must be as minimally intrusive as possible.

The use of closed circuit television in child abuse cases, where the child is unable or reluctant to testify against an adult member of the family, is a minimally intrusive infringement on the right of confrontation. Considerations of public policy require that testimony from the alleged victim of abuse be received without further psychological injury to the child. So long as the right of cross-examination is preserved in such cases and all interested persons can observe the alleged victim as he or she testifies, the use of closed circuit television is not prohibited by the confrontation clause of the federal or state constitution.[7]

Ludwig argues that eyeball to eyeball contact between witness and accused is necessary to insure the trustworthiness of the witness's testimony and that any testimony given in the absence of such contact is inherently unreliable.[8] We disagree. The right to confront does not confer

7. Since the trial of this case, the legislature has provided by statute for receiving the testimony of child abuse victims by closed circuit television for good cause shown. See: 42 Pa.C.S. § 5985(a).

8. If this test is to be deemed an adjunct of the right to confront one's accuser, much of the evidence relied upon by courts of law will be rendered inadmissible. In criminal trials, courts would not be permitted to receive testimony recorded via depositions, testimony given at a prior trial, dying declarations, statements of a conspirator made

upon an accused the right to intimidate. The reliability of an abused child's testimony does not depend upon his or her ability to withstand the psychological trauma of testifying in a courtroom under the unwavering gaze of a parent who, although a possible abuser, has also been provider, protector, and parent. The reliability of the child's testimony can be assured in such cases by requiring the child to submit to cross-examination while the jury and the accused observe the demeanor of the witness as he or she responds to questions. In the case sub judice, this was accomplished by closed circuit television.

The evidence established good cause for the procedure utilized by the trial court. This evidence showed that the victim had been able to describe, in detail, the sexual acts which had been perpetrated upon her by her father to social workers and law enforcement officials prior to the preliminary hearing. At the preliminary hearing, when asked to describe the sexual acts in the presence of her father, she initially stated that she could not remember the events and then fell into silence when further questions were asked. Others who were present said that the child appeared to be frightened. After the preliminary hearing had been recessed, she explained that she had not answered the questions asked of her because she was afraid of her father. A psychiatric evaluation of the child conducted approximately one week later revealed that she had, in fact, been psychologically injured by her brief and unsuccessful attempt to testify in the presence of her father. During this evaluation, the victim showed signs of increased apprehension and fear and, as a result, was referred for therapy.

Dr. Robert Chupella, a psychologist employed by the Carbon-Monroe-Pike Mental Health/Mental Retardation Department, testified that he had examined the victim and had been present at the preliminary hearing when the victim

during a conspiracy, and business and public records. This is not the law, nor should it be. The test advanced by Ludwig would also present potential confrontational problems with respect to blind witnesses, some physically disabled witnesses, and witnesses who refuse to look at an accused while giving testimony.

was unable to testify. He opined that the reason the child had said she could not remember and had refused to answer questions during the preliminary hearing had been because, when in the physical presence of her father, she had frozen emotionally. In his opinion, he testified, the victim would be traumatized again if she were required to testify in court in the physical presence of her father. Specifically the doctor said:

I think this would exacerbate a number of the fears that she has been able to resolve in a pretty significant fashion; fears of adults, fears of relating to individuals, anxiety, depression, which I believe was evident in this child at the time of her placement.

I believe that she could regress to that pre-morbid personality and that personality is one of withdrawal and muteness given the stress of having to testify against the parents face-to-face.

I also believe that there is a strong chance that her academic progress in school was suffering because of the circumstances she was involved in. Upon testing her, she tested average intellectual ability and certainly did have a good chance of academic progress given her intellectual standing. So, there is also a possibility of some regression in school in terms of academic performance.

. . . . .

I believe that there would be a likelihood that the proper progress would be stunted and, in fact, that she could regress with the type of emotional arousal that she would be undergoing by reliving, by reexperiencing those episodes in a relatively scary environment. I think that that certainly can be enough stress to have her regress to the point when she first entered into foster care. (N.T. 10/23/84 at 50, 52).

Under these circumstances, the trial court determined that the use of closed circuit television equipment was necessary to protect the welfare of the child. The trial court acted properly and within its discretion. The court did nothing more than adopt modern technological means to

allow the jury to hear testimony which otherwise would have been unavailable. The use thereof did not violate the defendant's right to confront the witnesses against him. It served only to enhance the fact-finding process.

The judgment of sentence is affirmed.

BROSKY, J., joins this opinion.

MONTEMURO, J., joins the majority opinion and files a separate concurring opinion.

TAMILIA, J., joins the majority opinion and files a separate concurring opinion.

DEL SOLE, J., joins the majority opinion, the concurring opinion by MONTEMURO, J., and files a separate concurring statement.

JOHNSON, J., joins the majority opinion and the concurring opinion by MONTEMURO, J. He also joins Parts I, II, III, IV and V of the dissenting opinion by CIRILLO, President Judge.

CIRILLO, President Judge, files a dissenting opinion in which POPOVICH, J., joins.

OLSZEWSKI, J., joins the dissenting opinion by CIRILLO, President Judge, and files a separate dissenting opinion.

MONTEMURO, Judge, concurring:

I join Judge Wieand's excellent opinion and write separately only to emphasize one matter. As has already been pointed out, the ideal of face to face confrontation is subject to adjustment depending upon the adverse interest to be protected, as long as there is "no material departure from the reason of the general rule." *Snyder v. Massachusetts*, 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1933). Judge Wieand has found that appellant's right of confrontation was in no way abridged by use of the closed circuit television monitor to broadcast the victim's testimony, and that there has indeed been no "departure from the reason

of the rule". Where children are involved, as victims of (sexual) abuse, the interest adverse to that of the accused is the state's obligation as *parens patriae*, the ultimate parent, to protect its charges, simply because, by virtue of their age, they labor under a disability. They are, as Judge Tamilia points out, qualitatively different from adults, particularly when they have been victimized. To ignore the difference is to disregard the protective responsibility, although it is in fact the motivating factor in the recent criminalization of child abuse in Pennsylvania's legislation.[1] Its importance here is in the recognition that the inherent weakness of children, which allows the sort of exploitation being prosecuted, leaves the victim open to further persecution if the state's obligation to prevent additional harm is not fulfilled. Appellant capitalized upon his child's vulnerability to perpetrate the abuse, and again at the preliminary hearing to prevent her testimony. Without the court's (successful) intervention in reconciling appellant's interests with that of the child, appellant could have at trial as well used not only his presence, but the system itself to frighten his daughter into "silence or anxiety-produced confusion." Mahady-Smith, *The Young Victim as Witness for the Prosecution: Another Form of Abuse?*, 89 Dick.L.Rev. 721, 743 (1985). To accomplish this result with the connivance, or at least the acquiescence, of the state would override not only formalistic expressions of constitutionality, but the basic fairness such concepts as the right of confrontation are meant to preserve.

Moreover, there is evidence to suggest that by doctrinaire insistence on "eyeball to eyeball" contact, the opposite effect is actually achieved, that is, the notion that with especially susceptible witnesses, "anxiety influences memory by interfering with focused attention." *Id.* at 724, n. 21. In such witnesses, particularly children, stress can operate

---

**1.** Not until the 1982 passage of the amended Child Protective Services Law was the accepted wisdom dispelled that child abuse was a problem to be addressed by social service agencies, rather than a crime requiring law enforcement intervention. *Attorney General's Family Violence Task Force Report, Violence Against Children* (1987).

to the extent that the increased tension generated by face to face confrontation would decrease rather than increase probity. G.B. Melton, Procedural Reforms to Protect Child Victim/Witnesses in Sex Offense Proceedings, in *Child Sexual Abuse and The Law* (1981). Since a trial is the process of seeking truth, technological advances which facilitate that process while preserving intact all of the interests involved are not to be lightly disregarded.

DEL SOLE and JOHNSON, JJ.; join.

TAMILIA, Judge, concurring:

I vote to join Judge Wieand's majority Opinion and write separately to express my views concerning the complexity of this matter. I am troubled by the fact that there was no statutory authority for the procedure adopted here and the proceeding is viable only upon application of exceptions to the rule that a party has the right both to confrontation and cross-examination of a witness against him. The majority finds such exceptions, yet but for the overwhelming fact that we are dealing with a child victim, I would be compelled to join the dissent. We do not need the testimony or treatises of behavioral science experts to establish that, qualitatively, such a witness, *who is also a victim*, is not to be equated with a normal or average adult. Such a witness is at a considerable disadvantage in the courtroom search for truth, and to assure that the mythical scales of justice are evenly balanced, special consideration must be given to proceedings wherein a child is a victim. This country was recently shocked and dismayed by the trial in California involving alleged child molestation victims by day school personnel. Regardless of the merits of that case, the fact that the *preliminary hearing* lasted *seventeen months* is considered by virtually all legal and behavioral science experts as an abomination and a perversion of the judicial process in the harm it has done to the children (and probably many of the adults as well).

From the late nineteenth century, to the present, it is a time clearly perceived by most authorities to be the era of

enlightenment in the care and treatment of children. To illustrate where we have been and how far we have traveled in our treatment of children, the following excerpt from a law review article written by this writer is illuminating.

Throughout history the child was considered chattel and even in Roman Law, "The Law of the Twelve Tables" granted the father the right to sell his child. During the Middle Ages the lot of the child was harsh with numerous children being abandoned as newborns or at an early age. The child's position in the family came after the father, cattle and mother—in that order. A note found in an early writing indicated that five to six thousand abandoned children, mostly in Paris, were brought yearly to the house founded by Vincent DePaul. Because of the value placed on children and the lack of insight into their needs, child psychiatry, as a discipline, could not have existed before the 20th century. It was not until the end of the 18th century that laws were instituted for the prevention of crimes against children—in particular, the destruction of the newborn, easily practiced in the absence of compulsory registration of births. In France, the edict of 1556 instituted severe penalties for infanticide but with little effect, and infanticide progressively increased, reaching a peak in the 18th century. Prussion law existing in 1230 included the statement:

Be a man laden with sick women, children, brothers, sisters or domestics, or be he sick himself, then let them be where they lie, and we praise him too if he would burn himself or the feeble person.

The child was a common victim of witchcraft, and the Children's Crusades resulted in mass death marches of children caught up in a state of religious hysteria, neither controlled nor protected by their parents or society. The Renaissance saw bright spots in Italy, France and England where enlightened families placed wives and mothers in prominent roles, educated their children, condemned corporal punishment and controlled children with love rather than fear. These techniques, however, were limited to a very small elite class with the major portion of

society utilizing a most dismal barbarism in dealing with children. The practice of nourrices (foundling homes) resulted in the death sentence to children in France. From 1776 to 1790, one hundred thousand children were received in a foundling hospital. Of these only 15 thousand children survived. An unpaid nursing fee left a child to his own fortunes, and often to die from the neglect. The outcry of Rousseau led to a greater interest in children and the cruel practices came to be more fully noticed.

Between 1881 and 1890, 142 out of every one thousand English children died within their first 12 months. In the six years from 1870–1877 the school board had removed from the streets of London 8,508 homeless, lawless and destitute children. In 1816, three thousand children were imprisoned in various London jails, half under 17 years. Child labor was the general rule, and a certain factory employer reported before a House of Lords Committee in 1817 that he did not employ children under ten years of age—and he was more enlightened than most.

In colonial America, the lot of children was difficult but the child did not suffer the degradation and abuse of his European counterpart. Colonial puritanism required absolute respect, and the child was made to assume heavy responsibilities at a very early age. He was considered a small adult and at 14 or 16 years of age was expected to assume an adult role. The American child benefited from the closeness of the pioneer family and his economic value was high. European reports in the early 1800's criticized the early emancipation of children, which developed from the closer unity of family life, and the American approach was considered revolutionary. This is not to say that there were no dark areas in American child treatment, but the 19th century did see a great upheaval in the attitude toward children in American society. (Footnotes omitted.)

Tamilia, J., *Neglect Proceedings and the Conflict Between Law and Social Work,* 9 Duquesne Law Review, 579–581 (1971).

In this century, we have turned away from child labor, infanticide, abandonment or sale of children, crippling children to exploit them as beggers, incarcerating them and trying them as adults or granting immunity to abuse by parents. We have provided exceptions to their being equated as adults in every conceivable manner, throwing a protective blanket over them by law, practice and treatment. We have *denied* them the protection of the constitution in many ways, both in court proceedings and in their status as persons, *in their best interest.* It requires no expert testimony to establish that a child in an adult court room, subject to most creative and stressful means of getting to the truth, will react not as an adult but as a child. While this procedure is calculated to arrive at the truth with an adult, a child can only be expected to respond with emotional and physical reactions derived from terror. For a child not to "freeze" is unusual and to present a clear unequivocal statement of the occurrence is even more unusual. If the constitution may be interpreted broadly enough to deny them the rights of adults for their protection and in their best interest (denial of jury trial, denial of emancipation, right to contract, etc.), it can also be extended to soften (not eliminate) the harshness of their testifying in court and for the same reasons. The juvenile acts, dating from 1898, universally adopted throughout the country, are testimony to this recognition. To do otherwise is to provide a defendant charged with sexual or other child abuse with an overwhelming advantage inconsistent with equal justice.

I can perceive of no case where a person is more subject to terrifying pressure than a child testifying against her father in a sexual abuse criminal case. In such a situation, assuming the claim is valid and she has already been hurt physically and emotionally, she has been threatened by him to remain silent, she has been punished by removal from her home, she believes that she is guilty of breaking up her family, frequently she is unsupported by her mother or other relatives, or after their initial support, it is withdrawn and she faces the prospect that if she testifies and is not believed, she returns to the same environment to face

retribution and, most likely, further abuse. Regardless of what we do in this case, society will not tolerate our abandonment of children to this process.

The scales of justice can only be balanced by providing a procedure, such as videotaping, to permit evidence to be presented, which would otherwise be crushed either from internally generated fear or externally created intimidation. Our legislature and most others in this country are adopting procedures similar to that utilized here in recognition of a grave problem. This case does not have the benefit of such legislation, but I believe the law is sufficiently resilient to permit it, without denying the defendant his constitutional rights.

Judge Cirillo expounds on the loss of freedom and enjoyment of the innocent man who suffers imprisonment and the horrors thereof. We all tremble at this possibility in all cases. He ignores, however, the countless thousands of children who live in daily terror of an abusive adult and who carry the scars throughout life, frequently to mirror the abuse by becoming abusers and killers themselves. Our streets are filled with runaway children, child prostitutes and drug addicted youngsters who find the only escape from situations such as these is to run to the streets and a living death. The law, as it is interpreted by the dissent, does not protect them. Society requires a balancing in the search for truth and modern techniques, such as videotaping, provide an opportunity to do so. One cannot say the constitution prevents, in the way of confrontation, that which the framers never could have conceived to exist. A constitution, federal or state, broad enough to permit wiretapping and electronic surveillance, intruding on the right of privacy and the sanctity of the home, is most certainly broad enough to permit a means of confrontation, such as videotaping, which allows a child to tell his/her story in court without exacerbating his/her injury and preventing the defendant from having an advantage which stifles es-

sential testimony in a large number of cases.[1]

DEL SOLE, Judge, concurring:

I join the Opinion filed by my colleague, Judge Donald E. Wieand and the concurring statement by Frank J. Montemuro, Jr. I write separately only to suggest to the trial courts an alternative method of utilizing televised proceedings. When faced with the necessity of utilizing televised testimony of a child witness, courts should explore the possibility of keeping the witness in the courtroom before the jury. The defendant can observe the trial via closed circuit television. If possible, the jury should be able to observe the witness, not through the eyes of a television camera, but in person. See: *Matter of Appeal in Pinal County Juvenile Action*, 147 Ariz. 302, 709 P.2d 1361 (App.1985); Arthur, *Child Sexual Abuse*, Vol. 37, No. 2, Juv. & Fam.Ct.J. pp. 32–33. (1986).

CIRILLO, President Judge, dissenting:

I respectfully dissent. Though my learned colleague has masterfully expressed his position, I am unable to concur in his judgment that the procedure employed in this case was constitutionally sufficient.

1. I question the suggestion by Judge Del Sole that the courtroom environment is more appropriate for the child victim witness and the jury should be able to observe the witness in person rather than on videotape. The case cited for authority, *Matter of Appeal in Pinal County Juvenile Action*, 147 Ariz. 302, 709 P.2d 1361 (App.1985), was a juvenile court case in which no jury was present and the only intimidating factor to the six year old witness was the presence of the alleged juvenile delinquents who were then placed in an adjoining room, linked by video and audio transmission to the courtroom. The issue there was the constitutional right to confrontation. As Judge Lindsay Arthur states in *Child Sexual Abuse*, Vol. 37, No. 2, Juv. & Fam.Ct.J. (cited by Judge Del Sole), it is the total court experience that presents the problem. His article suggests a number of alternatives tailored to state laws and the needs of the situation partly to deal with the confrontation issue but also relating to the trauma of courtroom environment. There can be abuse with videotaping out of the court's presence as traumatic as anything happening in the courtroom. He suggested a number of videotaping alternatives, some more restrictive than here, others less restrictive. I would not limit videotaping to the procedure applied in the Pinal County Juvenile Action as its purpose would be defeated in a large number of cases.

Appellant has presented six issues for our review: (1) whether judicial delay excuses the Commonwealth from filing a second petition to extend the Rule 1100 period; (2) whether the six-year-old victim was competent to testify at trial; (3) whether there was sufficient evidence to convict the defendant; (4) whether the defendant was denied due process because of the judge's actions during the trial; (5) whether the rape conviction should merge with the conviction for involuntary deviate sexual intercourse; and (6) whether the use of one-way video at trial violated the defendant's right of confrontation under the United States and Pennsylvania constitutions. As these matters have been fully briefed and argued, I believe that this court has an obligation to thoroughly discuss and analyze them. Towards that end a brief recapitualition of the relevant facts is necessary.

In November of 1983, Paul and Rose Ludwig and their six children moved from the apartment where they had lived for four years to the Halstead residence in Monroe County. In January of 1984, Mrs. Cecilia Kuchinski, a caseworker at Monroe County Children & Youth (MCC & Y) told the Ludwigs that they could not continue to live in Mrs. Halstead's home due to a previous episode of child abuse which had occurred there. The family failed to move and on February 7, MCC & Y removed the Ludwig's six-year-old daughter from the family residence, and placed her in a foster home. A physical examination found no evidence of sexual abuse.

On July 30, 1984, the girl's foster mother, Lynn Morgan, told Mrs. Kuchinski that the girl had made specific claims regarding sexual abuse by her father. Mrs. Kuchinski then interviewed the child who stated:

My dad had sex with me, too. He put his penis in my mouth, he held my mouth open real wide. I tried to keep it closed, and he pried it open. I didn't want cream on my mouth. I felt like I was choking, I breathed out of my nose. He held me down by my hands and belly. He

pulled my clothes down around my feet. He licked me all over, and his tongue had blood on it. He turned me over and put his fingers in my butt, hurting me. I hit him but he said he'd tell mommy. I was afraid my daddy would put me to bed.... Daddy licked me all over. Daddy put his penis in my vagina. I was lying on the floor, and blood came out. Daddy locked all the doors and windows and I was screaming. Mommy wasn't home she was at a restaurant. Daddy went in and took a quick shower. There was blood on the rug, daddy made me clean it up with soap and water. Daddy went into kitchen and washed off his tongue. Daddy fixed supper and we ate noodles and then I took a shower. I threw the underwear away.

The girl also told of sexual contact by her mother. She then described an incident where she was abused by other persons at another location and she stated that her brothers had at one time tried to have sex with her.

The Coolbaugh Township Police Department filed charges against Paul and Rose Ludwig on August 9, 1984. The charges against Rose were later dropped due to insufficient evidence.

The preliminary hearing was held on August 28, 1984. One hour before it was scheduled to begin, Assistant District Attorney E. David Christine, Jr. interviewed the complainant in the presence of several other persons, including her foster parents.

During the course of the interview, the girl told her story in a manner consistent with the report of July 30, 1984. At no time during the interview did she say that she did not remember an important fact or incident. However, an hour later when she was questioned at the preliminary hearing, she did not respond to the Commonwealth's questions. She said she could not remember and refused to answer any questions concerning her father's alleged abuse. As a result of her inability to testify against the defendant at the preliminary hearing, the Commonwealth was granted a continuance to petition the court for leave to videotape the

girl's testimony. The court held a hearing on the petition on October 23, 1984. The Commonwealth presented testimony from Dr. Robert Chupella indicating that the victim had emotionally frozen at the preliminary hearing, and that if forced to relate the incidents of sexual abuse at another preliminary hearing or at trial, her ability to tell the truth would be impaired. Dr. Chupella testified that approximately twenty percent of all child abuse victims completely freeze when questioned about the incidents in court. He stated that the child's natural reluctance to talk about the abuse is increased in the presence of the molester. He also said that approximately fifty percent of all abused children will freeze to some extent. Dr. Chupella testified that a child might be adversely affected if forced to testify in front of a parent who had molested the child. He said this is a scary experience for anyone and particularly for a child. The doctor stated that the child may become withdrawn and maladjusted. He said that though the victim had previously suffered from these symptoms, she had improved greatly since her placement in foster care. He was worried that forcing her to testify might cause a relapse and destroy the psychological progress the child had made.

On October 31, 1984, the court granted the Commonwealth's petition. On December 31, 1984, a preliminary hearing was held before District Justice Clara Pope. At the hearing, K.L. testified via closed circuit television and identified her father as the person who had sexually abused her by placing his penis in her vagina and in her mouth. Based upon this testimony, the District Justice bound the defendant over to court on all charges.

On December 26, 1984, the Commonwealth filed a Petition for Extension of Time under Pa.R.Crim.P. 1100. At a hearing held on January 10, 1985 to consider this petition, the time in which to try the case was extended to February 11, 1985 by stipulation of counsel, and trial was set to start on February 5, 1985. On February 4, 1985, the defendant filed an omnibus pre-trial motion, raising several difficult issues of fact and law. The court told counsel that it would

need time to resolve the motions. The trial was then postponed until March 7, 1985, though the Commonwealth stated that it was still prepared to go to trial on February 5.

On February 20, 1985, the defendant filed a motion to dismiss the case under Pa.R.Crim.P. 1100 because the trial had not begun by the stipulated expiration date of February 11, 1985. This motion was denied. On March 6, 1985, one day before the scheduled trial date, the defendant filed a second motion to dismiss under Pa.R.Crim.P. 1100, which the court denied on the same day. Also on March 6, 1985, after an in-chambers examination of the child, the court determined that the child was competent to testify. At the competency hearing, the child indicated that she understood what it means to tell the truth and that she sometimes tells "baby lies" which are little things that didn't happen. She said that baby lies are different from regular lies because regular lies are more important. She also stated that she might tell a baby lie in court but would correct herself. She testified that her foster mother had told her that she was going to court to help her mom and dad.

The trial began on March 7, 1985. At trial, the child testified via the same closed circuit television procedure which was used at the preliminary hearing. She was seated in a room separate from the actual courtroom. In the room with her was the camera operator, a speaker through which the girl could hear questions transmitted from the courtroom, a microphone through which her comments could be transmitted to the courtroom, and her foster mother, who was seated next to her during direct and cross examination. The judge, jury, attorney for the Commonwealth, attorney for the defendant, and the defendant were in the courtroom. They could each hear and see the child testifying via color television sets. The judge, attorney for the Commonwealth, and attorney for the defendant were able to speak to the child victim through individual microphones. At trial, the defendant presented the testimony of Dr. Barbara C. Wagner, who had examined the victim when she was removed from the parental home. Dr. Wagner testified that she had

found no evidence of sexual abuse and that the girl's genitals had not been damaged. But, Dr. Wagner also testified that in many cases of child molestation, any physical damage is minor and will quickly heal.

The court imposed a sequestration order during trial but exempted Lynn Morgan, the girl's foster mother, and Jean Brown of MCC & Y. The court also limited defense counsel's cross-examination of these two witnesses. Counsel wished to show that Morgan and MCC & Y had plotted to fabricate the sexual abuse charge in order to remove the child from her parents' household. The court ruled that the inquiries were improper. Also during trial, the judge questioned K.L. as to some matters which he felt needed clarification. On two occasions, he also restricted the scope of counsel's cross-examination even though the Commonwealth had not raised any objection. The trial ended on March 8 and the jury found Ludwig guilty of all charges. The defendant filed timely post-verdict motions which were denied. After sentencing, Ludwig appealed.

## I.

Pennsylvania Rule of Criminal Procedure 1100 requires that a criminal defendant must be brought to trial within 180 days of the date charges are filed against him. The Commonwealth must use "due diligence" to bring an accused to trial within the statutory period. *Commonwealth v. Colon*, 317 Pa.Super. 412, 425–26, 464 A.2d 388, 395 (1983). If the Commonwealth cannot meet the Rule 1100 deadline despite its good faith efforts, it may petition the court for an extension of the period. *See* Pa.R.Crim.P. 1100.

In this case, the Commonwealth filed such a petition on December 26, 1984. By agreement of the parties the Rule 1100 period was extended to February 11, 1985. Appellant argues that Rule 1100 was violated because his trial did not begin until March 7, 1985. I disagree.

Defense-caused periods of delay are excluded from computation of the 180–day period. *Commonwealth v. Polsky,*

493 Pa. 402, 406, 426 A.2d 610, 613 (1981); *see also Commonwealth v. Armstead,* 359 Pa.Super. 88, 91, 518 A.2d 579, 581 (1986) (defense-caused delay and period of time up to earliest practicable trial date automatically excluded from Rule 1100 period). Ludwig filed his pre-trial motions on February 4, 1985, one day before the trial was due to start. The Commonwealth was ready to go to trial the next day. The Court rescheduled the trial so that it could resolve the issues raised in defendant's motions. The earliest possible trial date then available was March 7, 1985. Therefore, the delay from February 11 to March 7 was caused by the defendant and was properly excluded from the Rule 1100 period.

## II.

Under Pennsylvania case law, a child witness is competent to testify if the court determines that she has: (1) the capacity to communicate, including an ability to understand questions and to express intelligent answers; (2) the mental capacity to observe and remember the occurrence; and (3) an understanding of the duty to speak the truth. *Commonwealth v. Hart,* 501 Pa. 174, 177, 460 A.2d 745, 747 (1983). Decisions concerning competency of a witness are within the discretion of the trial court and will not be disturbed upon appeal, absent an abuse of discretion. *Id.* A review of the transcript of the preliminary hearing shows that the court did not abuse its discretion in determining that Karen was competent under the *Hart* three-part test.

The child's answers were intelligently phrased in full sentences. Her descriptions of the alleged incidents were detailed and complete. She also demonstrated that she understood the importance of telling the truth. She stated that it was wrong to tell a lie and that she would be punished if she did. She said she would try and tell the truth. The child did say that she sometimes told baby lies but she stated that it would be wrong to do so during trial, and if she did so, she would correct the mistake. Thus, the trial court properly found her to be competent to testify.

## III.

It is axiomatic that an appellate court, in evaluating the sufficiency of the evidence, must determine whether, viewing the entire record in the light most favorable to the Commonwealth as verdict winner and making all reasonable inferences in its favor, there was sufficient evidence to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Stoyko*, 504 Pa. 455, 462, 475 A.2d 714, 718, *cert. denied*, 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984).

Appellant argues that the victim's testimony was not credible and that it was contradicted by the testimony of Dr. Wagner. Ludwig claims that Dr. Wagner stated that there was no physical evidence of rape. However, the doctor also testified that in cases of child abuse, there is usually no physical evidence of molestation. A slight penetration or rubbing of the vagina could have healed by the time of examination.

Issues of credibility are properly left to the trier of fact. *Commonwealth v. Smith*, 502 Pa. 600, 604, 467 A.2d 1120, 1122 (1983). A reviewing court may reverse only if the testimony is so contradictory that any verdict based upon it must be pure conjecture. *Id.* That is not the situation in this case.

The child's story was consistent from the first time she told it right through her testimony at trial. In view of her age, she did very well under cross-examination. Her testimony and pre-trial statements portrayed a chilling and perverse story in detail that a six-year-old would have difficulty fantasizing. The girl did contradict herself on occasion. However, she stuck to the essentials of her story during almost three hours of confusing cross-examination. Time and again, she told what was in essence the same horrible story about her father. Her testimony was not so contradictory as to make the jury's verdict pure conjecture.

## IV.

Ludwig next claims that his rights to due process were violated because the trial court: (1) refused to sequester

two of the Commonwealth's witnesses; (2) improperly questioned the victim; and (3) improperly limited the cross-examination of two Commonwealth witnesses. I agree with the majority that each of these contentions is meritless.

Witnesses may be sequestered to prevent one witness from shaping his or her testimony in accordance with testimony given by other witnesses. *Commonwealth v. Albrecht*, 510 Pa. 603, 620, 511 A.2d 764, 772 (1986), *cert. denied* —— U.S. ——, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987). Appellant argues that the trial court should have sequestered the victim's foster mother, Lynn Morgan. However, Morgan's testimony did not concern any of the matters testified to by the child. The child testified about the alleged acts of abuse committed by her father. Morgan testified about how she became aware that the girl had been abused and about whether she had any motive to coach the girl to lie. Their testimony did not overlap, so there was no danger of shaping and no need for sequestration.

The trial judge always has the right to interrogate witnesses as long as he does not do so in an unbiased manner. *Commonwealth v. Hammer*, 508 Pa. 88, 100–01, 494 A.2d 1054, 1060 (1985). In this case, the judge questioned the girl in order to clarify some ambiguous matters for the benefit of the jury. He did not demonstrate any bias for or against Ludwig.

Appellant also claims that his cross-examination of Lynn Morgan and Jean Brown was limited and interrupted by the trial court to such an extent that he was deprived of a fair trial. However, a trial court may limit cross-examination based upon concerns of efficiency and confusion. *Commonwealth v. Lee*, 262 Pa.Super. 280, 292–93, 396 A.2d 755, 761 (1978). In this case, the judge limited cross-examination because appellant's counsel wished to pursue irrelevant inquiries as to Morgan's fitness as a foster mother. This issue may affect the child victim's future placement, but it was wholly irrelevant as to the question of her father's guilt or innocence.

## V.

Appellant asserts that the crimes of involuntary deviate sexual intercourse and rape should merge for sentencing purposes. In *Commonwealth v. Adams*, 296 Pa.Super. 24, 442 A.2d 277 (1982), the court stated that when a victim is raped and then forced to commit oral sex, the criminal incident involves two separate offenses which do not merge for sentencing purposes. *Id.*, 296 Pa.Superior Ct. at 29, 442 A.2d at 280. As the court stated in *Commonwealth v. Wojciechowski*, 285 Pa.Super. 1, 9, 426 A.2d 674, 678, *allowance of appeal denied*, 285 Pa.Super. 1, 426 A.2d 674 (Pa.1981):

> It is unthinkable that a woman, once having been raped, is in the position where her attacker can then abuse her in any other fashion sexually, such as penetrating her anus or mouth with his penis, without incurring further sanctions for these separate and distinct crimes.

> "Defendant cannot escape criminal liability merely because he chose to subject the victim to every possible kind of aggressive, physically abusive, sexual behavior in his depraved arsenal."

The victim testified that her father placed his penis in her mouth and her vagina. The jury was justified in finding that Ludwig committed two separate crimes and the court was justified in sentencing him separately for each offense.

## VI.

Lastly, appellant argues that the trial court committed constitutional error by allowing his daughter to testify out of his physical presence. Ludwig claims that the Constitution requires an accuser to testify in open court, face to face with the accused. He bases his assertion upon the sixth amendment to the United States Constitution and article I, section 9 of the Pennsylvania Constitution. The prosecution argues that the right of "confrontation" protected by those provisions is satisfied as long as the accused has the opportunity to cross-examine his accuser. Because these clauses are worded differently, it is necessary to analyze this issue separately under federal and state law.

Our state constitution provides in pertinent part: "In all criminal prosecutions the accused hath a right ... to meet the witnesses face to face...." Pa. Const. art. I, § 9.

This clause and similar provisions in other state constitutions as well as the sixth amendment to the United States Constitution are firmly rooted in the history of Anglo-Saxon jurisprudence.

The genesis of the right of confrontation protected by these provisions has been traced to the reaction against the infamous abuses at the trial of Sir Walter Raleigh. *See, e.g.*, Graham, *The Right of Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One*, 8 Crim.L. Bull. 99 (1972); Heller, *The Sixth Amendment to the Constitution of the United States* 104–05 (1951); J. Stephen, *A History of the Criminal Law of England* 333 (1883); W. Holdsworth, *A History of English Law* 225 (1944).

On November 17, 1603, Sir Walter Raleigh, founder of the lost colony at Roanoke, went on trial in Elizabethan England for high treason. He was convicted, though the only evidence against him was a document containing the confession of Lord Cobham, an alleged co-conspirator. This document was obtained by members of the prosecution when neither Raleigh nor his counsel were present. Sir Walter's eloquent plea for justice was a precursor of the confrontation clause:

> But it is strange to see how you press me still with my Lord Cobham, and yet will not produce him; it is not for gaining of time or prolonging my life that I urge this; he is in the house hard by, and may soon be brought hither; let him be produced, and if he will yet accuse me or avow this confession of his, it shall convict me and ease you of further proof.

Sir Walter's anguished conclusion was:

> "The proof of the Common Law is by witness and jury; let Cobham be here, let him speak it. Call my accuser before my face, and I have done."

Phillimore, *History and Principles of the Law of Evidence*
157 (1850).

Thus, history demonstrates that the right of confrontation was born from a belief that justice requires that accused and accuser meet face to face in the courtroom. The importance of this right has traditionally been recognized in Pennsylvania case law. Furthermore, Pennsylvania courts have consistently held that the right of confrontation is broader than the right of cross-examination.

In *Commonwealth v. Russo*, 388 Pa. 462, 131 A.2d 83 (1957), our state supreme court explained the importance of an accused's constitutional right to face his accuser. The *Russo* court held:

> Many people possess the trait of being loose-tongued or willing to say something behind a person's back that they dare not or cannot truthfully say to his face or under oath in a Court room. It was probably for this reason, as well as to give the accused the right to cross-examine his accusers and thereby enable the jury to better determine the credibility of the Commonwealth's witnesses and the strength and truth of its case, that this important added protection was given to every person accused of a crime.

*Id.*, 388 Pa. at 470, 131 A.2d at 88.

In *Commonwealth v. McCloud*, 457 Pa. 310, 322 A.2d 653 (1974), the court plainly recognized that our state confrontation clause protects more than the right to cross-examine an adverse witness. The court stated that:

> "The Pennsylvania Constitution guarantees an accused the right to confront *and* cross-examine witnesses."

*Id.*, 457 Pa. at 311, 322 A.2d at 655 (emphasis added).

If the right to confrontation was completely coextensive with the right of cross-examination, the court would not have had to distinguish them from each other. Plainly, this important constitutional right consists of more than the right to cross-examine.

That it includes the right to face one's accusers at trial is also supported by another line of case law. It is unques-

tioned that a person may not be tried on criminal charges in absentia. *Commonwealth v. Doctor*, 228 Pa.Super. 304, 307, 323 A.2d 790, 792 (1974). In *Commonwealth v. Scoleri*, 399 Pa. 110, 160 A.2d 215 (1960), the court held that unless he waives it, a defendant has the constitutional right to be present at every stage of his trial. *Id.*, 399 Pa. at 124, 160 A.2d at 222. The defendant must be given the "opportunity to confront ... the witnesses...." *Id.*, 399 Pa. at 125, 160 A.2d at 223. This right to be present at trial is also based upon the constitutional right of confrontation. *Doctor*, 228 Pa.Super. at 307, 323 A.2d at 792.

Courts are very protective of this right and will not lightly find it to have been waived. A defendant must be guilty of serious misconduct before a court will order him removed from the courtroom. *Commonwealth v. Henderson*, 275 Pa.Super. 350, 356, 418 A.2d 757, 760 (1980).

Though this right to be present is based upon the constitutional right of confrontation, no one contends that it may be satisfied through the mere opportunity to cross-examine a witness. In *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), a defendant accused of armed robbery repeatedly disrupted his trial. The trial judge eventually ordered him removed from the courtroom. He was convicted, but the Seventh Circuit reversed, holding that although he had disrupted the trial, the decision to remove him from the courtroom while the trial proceeded constituted a violation of the accused's constitutional right to be present at trial. The Supreme Court reversed the circuit court and reinstated the conviction. The Court held that an accused's right to physically confront his accusers is fundamental but still may be waived by misbehavior. *Id.* at 339–44, 90 S.Ct. at 1058–61. But, the Court ruled that the misbehavior must be so disruptive that the trial cannot proceed in an orderly fashion. *Id.* at 343, 90 S.Ct. at 1060. Even then, the trial judge must first warn the defendant that if his behavior continues, he will be ousted from the courtroom. *Id.* In effect, the Court held that the right of

physical presence is so important that it may be abridged only under the most extreme circumstances.

In a concurring opinion, Justice Brennan wrote that because the defendant's right to be physically present is so important, trial courts should take careful precautions even when they find that the right has been waived. The Justice wrote that when courts eject the defendant from the courtroom, they should consider taking steps which will allow him to remain in contact with his attorney. *Id.* at 351, 90 S.Ct. at 1064. This might include a closed circuit television hook-up which permits the defendant and his attorney to remain in electronic contact. These protections would allow for effective cross-examination because the defendant would be able to watch the proceedings and stay in contact with his counsel. If he wished, he could respond to a witness's statement. These steps would enable defendants who have waived their right to be physically present at trial to preserve their right to effective cross-examination. Therefore, *Allen* recognizes the two rights as separable. If the right to confrontation protected only cross-examination, waiver of that right would constitute waiver of the right to effective cross-examination. Similarly, if cross-examination was constitutionally sufficient to protect the right of confrontation, a trial could properly be held in the defendant's absence as long as the right to effective cross-examination was preserved. The extraordinary procedures described above would then be constitutionally permissible in routine cases. The defendant's physical presence would be unnecessary. Yet, it is that very right to be physically present that the court held can be waived only upon a showing of serious misconduct. The court stressed the importance of the right in emphasizing that trial courts must be very careful before they find it to have been waived. Therefore, this line of cases also supports the proposition that the right of confrontation includes more than the right of cross-examination.

Case law, history, and the plain language of our constitution establish that in Pennsylvania, the right of confronta-

tion means that a person has the right to meet his accuser, face to face in the courtroom. Paul Ludwig was denied this right.

But this does not end our inquiry. Though the right of confrontation is important, it is not absolute. Face to face confrontation may be the constitutional ideal, but many adjustments and exceptions to the ideal are constitutionally permissible. *Commonwealth v. McCloud*, 457 Pa. 310, 312, 322 A.2d 653, 655 (1974).

In order to determine whether a particular exception is constitutionally permissible, a court must look to the state interest asserted and the dangers and risks of allowing the testimony in question. *Commonwealth v. Bradfield*, 352 Pa.Super. 466, 486, 508 A.2d 568, 578 (1986). The court must analyze the purpose the testimony is being offered for in light of the underlying purpose of the constitutional provision. *McCloud*, 457 Pa. at 312, 322 A.2d at 655.[1]

1. I do not believe that the right of confrontation unconditionally mandates that all witnesses offering evidence against an accused be required to testify in his presence or to meet him face to face. As noted above, face to face confrontation is the constitutional ideal but adjustments and exceptions are permissible. Based on the proffered analysis, the instant situation is not such a permissible exception. In no way should my position be construed as advocating an inflexible, unconditional mandate.

I must also note that after a careful explanation as to why no such right exists, my learned colleague concedes that the "right of confrontation" may be limited by a compelling state interest if the intrusion is minimal. However, the majority's limitation of Mr. Ludwig's confrontation rights seems to be based solely on the state's "compelling interest" in receiving the child's unhindered testimony, and fails to consider either the danger to the truth-determining process of allowing such testimony, or the underlying purpose of the constitutional guarantee of confrontation, as distinct from the right to cross-examine.

I am also concerned that the majority's ruling, besides vitiating the defendant's right to confrontation, will intrude on a separate but equally important constitutional right, and that is the right of a defendant to represent himself at trial. The constitutional right to counsel is but a reflection of the historical right of an accused person to defend himself in court or in the alternative to select a champion to represent his interests. The accused in the Anglo-American justice system, however, has never relinquished the right to self-representation, and it remains a right protected by the United States and Pennsylvania Constitutions. *See Faretta v. California*, 422 U.S. 806, 95

The asserted state interest in the situation before us is the need to protect the child victim from psychological harm. The Commonwealth argues that its interest in having her testify free of psychological harm is so great that the court was justified in narrowly infringing upon the defendant's right of confrontation. I disagree.

The Commonwealth has not demonstrated that the girl would suffer severe psychological problems if forced to testify in her father's presence. Dr. Chupella testified that the girl was very well adjusted for a child who had been sexually abused. He stated that based on his general experience with similar situations, it was his belief that forcing a child to testify in front of the parent might adversely affect the minor. He thought that here the victim might become withdrawn and maladjusted. This is very tenuous evidence. Dr. Chupella testified that the girl might be harmed by this type of exposure. He was unable to definitively state that she would be harmed or even that it was likely she would be psychologically scarred. Fundamental constitutional rights are too important for us to allow them to be abridged upon such weak evidence.[2]

S.Ct. 2525, 45 L.Ed.2d 562 (1975); Pa. Const. art. I, § 9 ("In all criminal prosecutions the accused hath a right to be heard by *himself* and his counsel...." (emphasis added)). If, in this case, Ludwig had chosen to act as his own counsel, he necessarily would have had to put his questions on cross-examination directly to the child witness. Would the majority hold that the status of the alleged victim as a child would prevent the exercise of this right due to possible intimidation of the witness, thus destroying not only the right to face-to-face confrontation, but the right even to cross-examine the witness?

**2.** Studies done in this area have been unable to reach a common consensus. Some studies have found that child sex victims who participate in judicial proceedings suffer more psychological harm than children who do not go to court. *See* Katz & Meyer, *Understanding the Rape Victim* 200 (1979). However, other evidence shows that children in general are unharmed by the criminal justice system. *See* U.S. Dep't of Justice, *When the Victim Is A Child* 17 (1985).

Even the evidence demonstrating that children are harmed is inconclusive as to what causes the harm. The above-cited Justice Department study found that most children are intimidated at the thought of facing their attacker. But the study also found that the same "experience is frightening for most adults...." *Id.* This same study found that child witnesses are overwhelmed by the physical attributes of the

My position, however, would be the same even if the Commonwealth could demonstrate that its witness would be psychologically harmed if forced to testify. Allowing his accuser to testify out of Ludwig's presence is at odds with the purpose of the constitutional right of confrontation. A trial is akin to a purifying process whereby the ultimate product is truth. The right to face one's accuser is part of this process as are the solemn trappings of a courtroom and the right of cross-examination. These safeguards are the purifiers through which an accuser's testimony must pass before it can be deemed believable. Each of them tests that accuser's veracity. To a large extent, they provide that test by making the act of giving testimony as stressful as possible. It is thought that stress helps to produce the truth by making it difficult to lie. The right of confrontation itself grew out of the psychological precept that it is more difficult to lie about a person in his presence. Sheltering a child witness from an important part of this system in order to protect her from stress is at odds with our constitutional protections. It allows her to testify free of the pressure which is essential to the truth-seeking process. Therefore, such testimony is inherently unreliable because it has not been "purified." Who is to say whether a child who refuses to testify in front of her alleged attacker has forgotten her testimony, emotionally froze, or is just unable to lie in the person's physical presence.[3]

courtroom, cross-examination, and the stress of repeating their story over and over. *Id.* at 18.

Therefore, the available evidence indicates that experts are unsure of the effect judicial proceedings have on children. The stress involved might be no more than that felt by an adult in a similar situation. Furthermore, the same experts are unsure which aspect of the justice system is most upsetting for children. They are unable to convincingly conclude that allowing a child to testify out of the attacker's physical presence will spare the child psychological trauma. One of the other aspects of the system may cause as much, if not more, psychological harm. Again, an accused's constitutional rights are much too important to trifle with based upon untested assumptions and theories.

3. Research has shown that children are less skillful than adults at describing past events. Goodman and Michelli, "Would You Believe a Child Witness," *Psychology Today* (Nov.1981). Younger children are

The danger of false testimony is even greater with a child witness than it is with an adult. It is not an abstract notion that children often lie in these cases. One spouse often convinces a child to accuse the other spouse of sexual abuse when custody is at issue. *See* "Couples Who Once Threw Plates Now Hurl Child Abuse Charges," *Washington Post Weekly Ed.* 34 (March 23, 1987). Eight percent of the hundreds of allegations of child molestation reported to Denver authorities in 1983 were deliberately false, according to a recent study. *Id.* I point to these facts not because I want to cast doubt upon the story of Ludwig's accuser. I want only to point out that children may become the unwitting pawns of unscrupulous adults. The child may wish only to please a parent or foster parent. Appellant's attorney suggested at trial that the victim may have been abused, but not by her father. She may have focused her charges upon her father out of a desire to please her foster mother. After telling the story a few times, she may have come to almost believe it. Or, possibly she felt it was necessary to tell for some reason. She did testify that she wished to tell the story because her foster mother told her that if she did so she would help her father. I note these possibilities not because the evidence supports such findings but because they are plausible. They are examples of the sort of dangers that are associated with this type of case. As such, they demonstrate why constitutional guarantees must be fully and vigorously enforced no matter who is on the witness stand. Once a person has been convicted, the

also more susceptible to suggestion than older ones. *See* Marin, Holmes, Gath, & Koval, "The Potential of Children as Eyewitnesses," 3 *Law and Human Behavior* (1979). As a well-known researcher has described:

> In one experiment, the researcher stood outside as the children played, then went to their classroom. He asked, "When you were ... in the yard, a man came up to me, didn't he? You surely saw who it was. Write his name on your paper." Only seven of the 22 eight-year-olds complied, until the experimenter asked, "Was it not Mr. M___?" Seventeen children said "yes," and later gave full descriptions of the man's appearance and attire, despite the fact that no one had approached the experimenter outside.

*See* Goodman, "Children's Testimony in Historical Perspective," 40 *Journal of Social Issues* 12 (1984).

prison doors slam shut with the same force, no matter how old the accuser.

I am aware that numerous other states have found that testimony such as that given by the child in this case is constitutionally permissible. In *State v. Sheppard*, 197 N.J.Super. 411, 484 A.2d 1330 (Law Div.1984), similar testimony was held admissible. The court held that the New Jersey confrontation clause reflects a preference for face to face confrontation at trial, but the main interest protected by the provision is the right to cross-examination. The court stated that adequate cross-examination may satisfy the clause even in the absence of physical confrontation. The court noted that videotaped testimony is only a modest erosion of the clause's guarantees and is justified by the importance of the child's interest in testifying free from psychological stress. *Id.*

However, the New Jersey Constitution protects the defendant's right of "confrontation," while our state constitution protects the right to a "face to face" meeting in court. Since the Pennsylvania Constitution explicitly protects the right of physical presence, it logically follows that the right must be given more strenuous protection than it is afforded under the more general provision in our sister state's constitution.

I will not quarrel with the *Sheppard* court's holding that cross-examination is the most important interest protected by the confrontation clause. Even assuming arguendo that physical presence is less important than cross-examination, it does not follow that it is unimportant or can be freely abridged. The *Sheppard* court stated that cross-examination alone will often satisfy the clause. In making this statement, the court relied on *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). But in *Douglas*, the witness had testified in the defendant's physical presence at a pre-trial deposition. The issue before the Court was whether the defendant was entitled to confront the witness at trial. The *Douglas* Court held that physical confrontation at the deposition was constitutionally

sufficient because the defendant was given the right to cross-examine the witness at that time. The Court stated that cross-examination satisfies the Constitution, but it referred to cross-examination where the accused and accuser are face to face.

The *Sheppard* court balanced the defendant's rights against those of the witness and determined that the system should protect the witness. This is a fundamental re-ordering of the priorities set forth in American constitutional law and jurisprudence. It is the foundation of our criminal justice system that a defendant's fundamental rights must be strenuously protected. To that end, he is presumed innocent and can be found guilty only on proof beyond a reasonable doubt. Our system prefers that a guilty person go free before an innocent man should be convicted. A child's stress at testifying can be overcome; in all but the most extraordinary case, that child will eventually put the experience behind her. She may suffer and she may be terrified while testifying, but any emotional scars caused by the experience are unlikely to be permanent, especially when compared with the traumatic character of the events themselves. However, a defendant who is wrongfully convicted of a heinous crime will never overcome his conviction. His name will be stigmatized for the rest of his days. He will have to suffer through years of imprisonment burdened with the knowledge that he is an innocent man. For these reasons, I believe that the New Jersey court made a constitutionally impermissible choice in *Sheppard*.

However, the Commonwealth has undercut its own argument in this case. The prosecution claimed that the closed-circuit testimony was necessary to protect the victim from the psychological harm which would result if she were forced to testify in her father's presence. But the prosecution has also asserted that she was unable to testify in front of her father, and that she emotionally froze at the preliminary hearing because he was present.

These two claims are inconsistent with each other. If she emotionally froze and was unable to testify, then she could not possibly suffer psychological harm from testifying. She would not be testifying, so she would not suffer the alleged adverse consequences caused by repeating her story in front of her father. Therefore, the prosecution is actually requesting that we create a constitutional exception to allow the state to gain the benefit of the witness's evidence. We are being urged to create a special procedure for child witnesses who are psychologically "unavailable" to testify.

I do not believe that this court should accept the prosecution's factual assumptions. Its witness did not respond when initially questioned at the preliminary hearing. Despite the Commonwealth's claims to the contrary, there was very little evidence presented demonstrating that her failure to answer was connected with her father's presence. She did not say that she could not testify in front of Ludwig. When questioned about the alleged crimes, she stated only that she could not remember. The state relies on Dr. Chupella's testimony at the special hearing on October 23rd. The psychologist stated that the girl emotionally froze at the preliminary hearing, but he did not base his findings upon an examination of the child. His testimony was based upon his general knowledge of abused children. Dr. Chupella claimed that twenty percent of all child abuse victims completely freeze when questioned in court and fifty percent partially freeze. One need not have an advanced degree in mathematics to immediately perceive the weakness in the prosecution's logic. If fifty percent partially freeze, then fifty percent do not. If twenty percent totally freeze, then eighty percent do not. It is impossible to reach any conclusion concerning the girl's behavior from statistics like these. She could very easily have been among the fifty percent of abused children who do not freeze at all. Naturally, the Commonwealth is loathe to concede this point because it would then have to justify its witness's behavior in some other manner.

Dr. Chupella also stated that freezing is caused by the trappings of a courtroom. According to his expert testimony, the alleged molester's presence only increases the child's natural reluctance to talk. Therefore, Dr. Chupella's testimony suggests that if the girl was unable to testify it was because she was upset at being in court. According to the psychologist, being face to face with her father may have increased her natural reluctance to talk, but he did not identify it as the main cause of the child's reluctance.

Even if the Commonwealth had demonstrated that the girl emotionally froze because of her father's presence, my position would be the same. In *Commonwealth v. Stasko*, 471 Pa. 373, 370 A.2d 350 (1977), the court permitted the use of a videotaped deposition at trial because the deponent was medically unavailable. The witness in question produced a doctor's report stating that she had had numerous abdominal operations for regional ileitis and ulcerative colitis and that the emotional strain of appearing for trial would greatly aggravate her condition. The video deposition which was admitted as evidence was taken in the presence of the trial judge, the appellant, his attorney, and an assistant district attorney. The witness was cross-examined by defense counsel. On appeal, the appellant argued that use of the deposition violated his right to physically confront the witness at trial. The court disagreed, holding that the witness was unavailable for trial and the prior testimony had sufficient "indicia of reliability" to render it admissible. *Id.*, 471 Pa. at 379, 370 A.2d at 353.

*Stasko* differs from this case in several respects. In *Stasko*, the witness claimed to be unavailable because the stress of the trial would aggravate a pre-existing medical condition. The Commonwealth argues here that its witness should be adjudged unavailable because of the stress of trial itself. However, the witness has no pre-existing medical condition which testifying will inflame. As previously discussed, a trial is supposed to provoke stress. Persons cannot be excused from judicial proceedings because they have a normal reaction to those proceedings.

The prosecution's claim is really just that its witness should be excused from testifying under normal procedures because it will be a strain as a result of her youth. This is the same argument discussed above and rejected.

The remedy devised by the trial court in *Stasko* was also altogether different than that used in this case. The witness's deposition was taken with strict safeguards. The defendant was present and his attorney cross-examined the witness. Therefore, the defendant's right of confrontation was preserved.

The present situation also differs from that where a witness forgets and his prior statement is admitted into evidence. Being unable to testify is not the same as forgetting. When a person states he is unable to testify, it may mean he is unable to lie. Here, the witness did not forget. She was able to testify out of her father's presence.

In order to facilitate the truth-seeking process, courts often admit reliable prior statements when the alternative is that the witness cannot testify. *See United States v. Bailey*, 439 F.Supp. 1303 (E.D.Pa.1977). Here, the witness was able to testify, but the Commonwealth realized it would be unhappy with the content of that testimony unless it was delivered sans constitutional protection. Therefore, its witness was not unavailable. She was merely unable to tell the story desired by the prosecution. Thus, when she eventually told her tale under sterile, carefully designed conditions, it was inherently dubious.

As noted above, the purpose of the proffered testimony must be balanced against the dangers and risks inherent in admitting it. *Bradfield*, 352 Pa.Super. at 486, 508 A.2d at 578. Here, the purpose of the witness's testimony is to determine the guilt or innocence of her father, Paul Ludwig. The defendant's entire future hinges on the child's evidence. Because this testimony is central to the case, the defendant's rights must receive the maximum possible protection.

There are multiple dangers in allowing closed-circuit testimony. Television inevitably distorts reality. It can often

make the person on screen seem larger than life. A viewer's perceptions are formed in large part by the camera angles and lighting which are employed. Also, the use of closed-circuit television may affect the presumption of innocence that a jury must give a defendant. It is only reasonable for a jury to assume that a defendant must have done something truly terrible to the child if she cannot even sit in the same courtroom with him. Even the most objective observer cannot help but be swayed by this sort of spectacle. When the witness is a child, the jury is sure to be even more prejudiced against the defendant as their sympathies will naturally lie with the victim. Therefore, in light of the importance of the witness's testimony, it is far too dangerous to allow its use at trial in such a prejudicial manner. *See Hochheiser v. Superior Court,* 161 Cal.App.3d 777, 208 Cal.Rptr. 273 (1984); *United States v. Benfield,* 593 F.2d 815 (8th Cir.1979).

In summary, I believe that we should hold that under the Pennsylvania Constitution, an accused has the right to face his accuser at trial. Ideally, this right calls for both parties to be physically present at trial. However, like other constitutional rights, this protection is subject to adjustment and modification if warranted under the circumstances. To determine whether a particular modification is constitutionally permissible, a court must balance the purpose of the proffered testimony with its risks in light of the underlying purpose of the constitutional protection. Allowing a child to testify out of the physical presence of her alleged attacker is impermissible because it is at odds with the very nature of the confrontation clause. Further, the State has been unable to demonstrate that child witnesses in general need such protection. The State has also failed to show that its witness here in particular needed these safeguards. Finally, the Commonwealth failed to prove that she emotionally froze when called upon to testify in her father's presence.

Though this case might have been decided based upon the Pennsylvania Constitution, our Federal Constitution also

protects the right of an accused to face his accuser in court. The sixth amendment provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...."

This language is not as explicit as the "face to face" language used in the Pennsylvania Constitution, but each clause grew out of the same historical concerns. The Supreme Court has traditionally recognized that the sixth amendment protects the right of physical presence. *See Pennsylvania v. Ritchie*, — U.S. —, —, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987) (confrontation clause protects defendant's right to physically face those who testify against him). Therefore, I would find that the trial court's actions in this case also violated the United States Constitution.

The Supreme Court has stated that the "literal right to 'confront' the witness at the time of trial ... forms the core of values furthered by the Confrontation Clause." *California v. Green*, 399 U.S. 149, 157, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970).

In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Court ruled that "the Confrontation Clause reflects a preference for face-to-face confrontation at trial...." *Id.* at 63, 100 S.Ct. at 2537. The Court, per Justice Blackmun, wrote that confrontation ensures reliability because "personal presence ... undoubtedly makes it more difficult to lie against someone, particularly if that person is an accused and present at trial." *Id.* at 63 n. 6, 100 S.Ct. at 2537 n. 6.

The Court has held that the primary interest protected by the clause is the right of cross-examination. *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). But this is far from the only right which it protects. In *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), the Court held that "Confrontation means more than being allowed to confront the witness physically." The holding of the *Davis* court

indicates that confrontation means more than physical presence, not less.

This recognition is not of recent vintage. The Court has recognized an accused's right to face his accuser in court since the 1800's. In *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895), the Court overturned a conviction based upon the transcribed testimony of two witnesses who were deceased by the time of trial. The Court held that an accused has the right to see a "witness face to face...." The Court also stated that "under no circumstances [shall he] be deprived of [this right]." *Id.* at 244, 15 S.Ct. at 340.

In *Kirby v. United States*, 174 U.S. 47, 19 S.Ct. 574, 43 L.Ed. 890 (1899), the Court held that an accused may be convicted only through the testimony of "witnesses who confront him at the trial [and] upon whom he can look while being tried...." *Id.* at 55, 19 S.Ct. at 577.

In *Dowdell v. United States*, 221 U.S. 325, 31 S.Ct. 590, 55 L.Ed. 753 (1911), the Court noted that the sixth amendment was "intended to secure the right of the accused to meet the witnesses face to face...." *Id.* at 330, 31 S.Ct. at 592.

This right of face-to-face, physical confrontation is so ingrained in our constitutional ethos that at one time observers claimed that an accused could not even waive the right. *See Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). As previously discussed, the Court held that the right may be waived but only by exceptional misconduct. *Id.*

Therefore, a review of the applicable case law shows that the Court has continually emphasized that the sixth amendment protects the right of an accused to face his accuser in court. The Court has never held that the confrontation clause is designed to protect only the right of cross-examination. Not only does the clause protect a right of physical presence, but the right is so important that it may be abridged only under extraordinary circumstances.

In *Delaware v. Fensterer*, 474 U.S. 15, 18, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam), the court identified two categories of cases in which it has dealt with restrictions on the right of confrontation. The first category includes cases where hearsay has been admitted as substantive evidence. The second involves situations where the trial court has restricted the defendant's cross-examination of a prosecution witness. *Id.* at 18, 106 S.Ct. at 294.

Though neither of these situations is precisely the same as the instant matter, it is possible to apply the underlying principles developed by the Court to this case. In the first situation, the Court has allowed a defendant's literal constitutional rights to be limited but only if the limitation furthers the truth-seeking process. In *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), the Court held that the confrontation clause does not require a showing of unavailability before a co-conspirator's out-of-court statements may be admitted. The Court stated that such statements are inherently reliable and irreplaceable as substantive evidence, and thus further the confrontation clause's mission of advancing the "truth-determining process." *Id.* at 396, 106 S.Ct. at 1127.

However, in *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), the Court held that reliance on a co-defendant's uncross-examined confession as evidence against an accused violated the defendant's right of confrontation. The Court ruled that such confessions are "presumptively unreliable." *Id.* at 539, 106 S.Ct. at 2061. The difference between *Inadi* and *Lee* is that in *Inadi*, the statements advanced the truth-seeking process while in *Lee* they did not.

In the case before us, the limitations placed on Ludwig's rights do not advance the truth-seeking process. As previously discussed, the trial court abrogated a basic constitutional safeguard. It did this because the victim was unable or unwilling to testify under traditional constitutional restrictions. In taking this action, the Court admitted testimony which was constitutionally suspect. Unreliable testi-

mony does not further the truth-seeking process but instead is an obstacle to its goals.

In the second situation identified by the Court, it permits restrictions on a defendant's rights if the restrictions will not affect the truth-seeking process. In *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Court overturned a conviction because the trial judge did not permit defense counsel to attack a witness's credibility by questioning him about his juvenile record. Because it may have interfered with the truth-seeking process, the Court found this restriction on the defendant's rights to be constitutional error.

The restriction on Ludwig's rights may similarly have affected the truth-seeking process. As previously noted, the use of closed-circuit television itself may prejudice the jury against the defendant. This case might very well have had a different result if Ludwig's rights had been fully protected. The girl was unable to tell her story in front of Ludwig. If the Court had insisted on protecting Ludwig's right to face his accuser, the jury probably would have had insufficient evidence upon which to convict him. However, because the Court did not protect this right, the jury heard the girl's evidence. Thus, the effect of the restriction upon Ludwig's right of confrontation is dramatic and apparent. It was possibly the difference between conviction and acquittal. This is a much more direct effect than that which occurred in *Davis*. There, the Court rejected the restrictions because they may have affected the truth-seeking process. Here, such an effect was all but unavoidable. Therefore, the trial court should not have permitted the restrictions.

Viewed from either of the perspectives the Court has brought to bear, the infringement of Ludwig's confrontation right was constitutionally impermissible. The trial court's actions violated both the United States and Pennsylvania Constitutions.

I do not take this stand lightly. I recognize that child abuse is a societal problem of alarming magnitude. I also

realize that the alleged crimes at issue in this case are truly harrowing and outside all bounds of human decency. However, this serves only to emphasize our obligation to strictly protect the defendant's rights. Our Constitution was designed to protect our rights during times of crisis as well as calm. Courts must guard against being caught up in the passions of the moment and casting off constitutional protections in the name of expediency. Society must deal with criminals but it must do so without violating their fundamental rights. This is the only way to ensure that we do not eventually trample upon the rights of the innocent.[1]

Courts should ponder long and hard before restricting a defendant's fundamental rights. This is particularly true in cases involving child abuse where the entire trial hinges on questions of credibility. We must all remember: it is so easy to accuse but so very hard to absolve.

Once a man is accused, there are those in the community who will always doubt him even if he is found innocent at trial. But imagine the torment of an innocent man wrongly convicted of a heinous crime. He must sit within a small

---

**4.** I must note that Judge Tamilia's concurring opinion which asserts that I am favoring criminals at the expense of their victims is sociologically, jurisprudentially and constitutionally flawed. He claims that providing criminal defendants the full panoply of their constitutional rights has caused our streets to be overrun with young, morally decrepit criminals. This simplistic analysis of a highly complex social problem is dubious, at best. It is the type of fact-based, policy analysis which is better handled by the legislative branch. It is not a judge's role to suspend the rights of a particular class of criminal defendants because a certain crime presents a difficult social problem. Our role is to interpret and apply the Constitution which mandates that a man is innocent until proven guilty. Until guilt is established, he is entitled to full constitutional protection. Once guilt is proven, the sword of justice should be harsh and unflinching. As a former trial judge, I take particular offense at the assertion that I am "soft" on criminals. I am the only judge on this court who has sentenced a convicted child abuser to approximately 20–40 years in prison. *Commonwealth v. Wojtczak*, 101 Montg.Co.L.R. 226 (C.P.1976), *aff'd per curiam*, 250 Pa.Super. 649, 379 A.2d 618 (1977). The distinction between that situation and this case is obvious. Here, the defendant has not yet been proven guilty at an untainted trial. Social problems often provoke emotional and politically expedient responses. But we must remember that the rights we take from the guilty are lost to us all.

cell and stare at the steel bars which separate him from the rest of society. He must lie awake at night and listen to the sounds of the cellblock, the anguished cries, the jangle of the guard's keys as he makes his rounds, all the while knowing that he has been unjustly imprisoned. He has been wrongly cut off from all of the things that each of us outside those walls takes for granted—the pleasure of a moonlit walk; a Sunday softball game; a drive in the country; dinner with his family; seeing his child's school play. He is an innocent man but he has been condemned for what might as well be eternity. Every second his heart must die a thousand deaths.

It is to guard against this type of horrible tragedy that the Constitution protects a defendant's rights. We must remember this before we glibly allow those rights to be "adjusted."

Therefore, this court should reverse and remand for a new trial. Accordingly, I dissent.

JOHNSON, J., joins parts I, II, III, IV and V.

OLSZEWSKI and POPOVICH, JJ., join.

OLSZEWSKI, Judge, dissenting:

I am generally in agreement with the Dissenting Opinion of President Judge Cirillo and, consequently, join in that opinion. I write separately to note that I am not unmindful of the very serious problems and unique considerations which arise when a young child is the victim of abuse and must testify in court. To that extent, I share in the concerns of the majority. In this case, however, the Commonwealth has not shown that the procedure utilized was necessary to prevent harm to the child and to ensure her trial testimony. Thus, the Commonwealth has not justified the creation of an exception to an accused's right to face his accuser as guaranteed by both the United States Constitution and the Pennsylvania Constitution. For this reason, I respectfully dissent.